# Illinois Official Reports

## Appellate Court

---

### *In re Kanfer*, 2013 IL App (4th) 121144

---

| | |
|---|---|
| Appellate Court Caption | In re: RUBY KANFER, a Disabled Adult, LAWRENCE KANFER and RUTH KANFER, Coexecutors Under the Last Will and Testament of Ruby Kanfer, Deceased, Plaintiffs-Appellants, v. BUSEY TRUST COMPANY, Former Guardian of the Estate of Ruby Kanfer, a Disabled Adult, Defendant-Appellee. |
| District & No. | Fourth District<br>Docket No. 4-12-1144 |
| Filed | November 25, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from a dispute over defendant trust company's management of the estate of a disabled adult, the trial court properly found that *res judicata* barred any recovery for various management fees, the hourly charges for a contractor's work on one condominium and the alleged investment losses due to the trust company's failure to implement the investment model the company generally used for an estate of the size being managed; however, the dismissal of plaintiffs' claim for defendant's failure to properly maintain the estate's Illinois and Florida properties was reversed and the cause was remanded for further proceedings. |
| Decision Under Review | Appeal from the Circuit Court of Champaign County, No. 05-P-52; the Hon. Brian L. McPheters, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded. |

| Counsel on Appeal | Robert A. Stuart, Jr. (argued) and Emmet A. Fairfield, both of Brown, Hay & Stephens, LLP, of Springfield, for appellants. |
|---|---|
| | Edward M. Wagner and Tamara K. Hackmann (argued), both of Heyl, Royster, Voelker & Allen, of Urbana, for appellee. |
| Panel | JUSTICE APPLETON delivered the judgment of the court, with opinion. Justices Pope and Holder White concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiffs, Lawrence Kanfer and Ruth Kanfer, are the coexecutors of Ruby Kanfer's will. She was their mother. During the final 2 1/2 years of her life, Main Street Bank and Trust Company (Main Street) and, later, its successor, Busey Trust Company (Busey), were the guardians of her estate. Plaintiffs seek to surcharge Busey for mismanaging the estate. On Busey's motion (735 ILCS 5/2-619.1 (West 2012)), the trial court struck some of the paragraphs of the second amended petition for surcharge. The court made a finding pursuant to Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010), and plaintiffs appeal.

¶ 2    We affirm the trial court's judgment in part and reverse it in part, and we remand this case for further proceedings. We agree that section 24-11(b) of the Probate Act of 1975 (Probate Act) (755 ILCS 5/24-11(b) (West 2012)) and *res judicata* bar plaintiffs from recovering management fees, the hourly charges for work a contractor did on a condominium in Champaign, and losses from the failure to implement an investment model. Plaintiffs are not barred, however, from recovering any losses that resulted from failing to keep Ruby Kanfer's condominiums in adequate repair.

¶ 3                                    I. BACKGROUND
¶ 4                          A. The Appointments of Guardians
¶ 5    On February 23, 2005, Lawrence Kanfer petitioned the trial court to appoint him as Ruby Kanfer's personal guardian and to appoint Main Street as the guardian of the estate. He alleged that Ruby Kanfer had been diagnosed with depression, memory disturbance, and diabetes and that she had deteriorated mentally and physically to the point that she no longer could use sound judgment regarding her personal care, medical needs, and financial affairs.

¶ 6      On February 28, 2005, the trial court appointed an attorney, Andrew Bequette, as guardian *ad litem*.

¶ 7      On March 2, 2005, Ruth Kanfer filed a counterpetition to be appointed the guardian of Ruby Kanfer's person and estate.

¶ 8      On March 2, 2005, the trial court appointed Lawrence Kanfer as the temporary guardian of the person of Ruby Kanfer and Main Street as the temporary guardian of her estate. Main Street accepted the appointment.

¶ 9      On March 17, 2005, Ruby Kanfer and an attorney, Arthur M. Lerner, petitioned that the trial court "confirm and allow Ruby Kanfer to employ Lerner Law Offices as her attorney to defend her" in this matter. On March 22, 2005, the court authorized the hiring of Lerner as Ruby Kanfer's attorney while keeping in force the appointment of Bequette as the guardian *ad litem*.

¶ 10      On May 9, 2005, the trial court appointed Lawrence Kanfer as the permanent guardian of Ruby Kanfer's person.

¶ 11      On May 10, 2005, the trial court entered an "Interim Order for Guardianship of the Estate," in which the court found that although Ruby Kanfer still was disabled by moderate dementia, it was in her best interest "that she be allowed to continue to trade securities on a limited basis." Therefore, the court authorized Main Street to "set up a trading account for Ruby Kanfer at Wachovia with a beginning balance of $100,000.00." Ruby Kanfer was to be allowed to "use the funds within this account to make securities trades as she wishe[d]," but she would not be allowed to make withdrawals from the account without further court order. Main Street would have no fiduciary duty with respect to the account. For the time being, until the court made a final decision as to who was to be the permanent guardian of Ruby Kanfer's person, the court prohibited Main Street, without the prior approval of all parties, from moving any of her funds from the institutions where they currently were located. (Even though, on May 9, 2005, the court appointed Lawrence Kanfer as the permanent guardian of Ruby Kanfer's person, apparently the permanency of his appointment was in question.) Main Street could, however, move funds into different accounts within the same institutions.

¶ 12      On May 19, 2005, Ruby Kanfer, through her attorney, Lerner, moved to set aside the order appointing Lawrence Kanfer as the permanent guardian of her person.

¶ 13      On July 13, 2005, the trial court found that Ruby Kanfer was "not totally lacking in the capacity to make or communicate responsible decisions regarding the care of her person." The court further found it was in Ruby Kanfer's best interest that Ruth Kanfer be appointed the guardian of her person. Therefore, the court revoked its order appointing Lawrence Kanfer as the guardian of the person, and the court appointed Ruth Kanfer as the limited guardian of the person, ordering her to "exercise her statutory power of guardianship only to the extent necessitated by [Ruby] Kanfer's actual mental, physical and adaptive limitations." At its conclusion, the order added: "The appointment of the GAL is to continue until further order as is the attorney-client relationship between the ward and Mr. Lerner." Joseph Pavia later replaced Lerner as Ruby Kanfer's personal attorney.

¶ 14    On September 23, 2005, in view of the appointment of Ruth Kanfer as the permanent guardian of Ruby Kanfer's person, Main Street filed a motion to lift the restrictions on its authority as guardian of the estate. Main Street explained that "[t]he Ward [was] anxious to move funds which exceeded FDIC [(Federal Deposit Insurance Corporation)] limits from banks and to have additional funds added to her Court authorized trading account" and that, without the full powers of a guardian of the estate, Main Street was unable to "respond to the requests of the Ward or to adequately manage her Estate."

¶ 15    In a hearing on October 27, 2005, attended by Bequette, Ruth Kanfer, Lawrence Kanfer, and the attorneys for Ruth, Ruby, and Lawrence Kanfer, the trial court granted Main Street's motion, lifting the restrictions on its authority as guardian of the estate.

¶ 16    The trial court directed Main Street to continue charging an hourly fee for its work until all of Ruby Kanfer's assets were consolidated at Main Street. After the consolidation, Main Street would be paid monthly in the amount of ".85% of assets managed with all additional work being charged hourly. Additional work [would] include but not be limited to work associated with the real property of the Ward, the Frederick Kanfer Estate, work investigating the stock certificates, bonds, and disclaimed certificates of deposit found in the inventory of the safe deposit box at Main Street Bank & Trust and any additional meetings, phone calls, and/or other services provided to the account."

¶ 17    In addition, the docket entry for October 27, 2005, reads: "By agreement the estate guardian is relieve[d] of the burden at this time of making any inspections of the ward's property in Florida. No written order required."

¶ 18                               B. The Approved Accounts
¶ 19                               1. The First Accounting

¶ 20    On May 3, 2006, Busey, the successor of Main Street, filed a "Petition To Approve [the] Annual Accounting" for the period of March 1, 2005, to March 31, 2006. The petition notes: "The Annual Report and Accounting reflects the numerous accounts and holdings in this Estate[,] and since the assets have not yet been combined in one wealth management account, it contains Exhibits showing the status of accounts at different banks." This account, which was more than 400 pages long, listed the disbursements and receipts and identified all of Ruby Kanfer's assets, including bank accounts, stocks, and bonds.

¶ 21    In a verified narrative prefacing the account, Kathleen Moore, a trust officer, explained that Busey had maintained many of Ruby Kanfer's assets in liquid form "in case it became necessary to fund the trusts" that Ruby Kanfer's deceased husband, Fred Kanfer, had created.

¶ 22    In its brief, Busey describes the hundreds of pages of documentation attached to Moore's narrative, a description that plaintiffs do not appear to dispute:

          "Attached to Moore's narrative were documents identifying: (1) the Initial Balances of Kanfer's accounts at various banking institutions; (2) the Estate Summary as of March 31, 2006 (including the identity of banks where funds were located and the type of asset held (i.e. checking account, savings account, [individual retirement account (IRA)], bonds)); (3) disbursements paid from, deposits into, and interest

- 4 -

earned on, various accounts by account and date; (4) appraisals of coins and jewelry; (5) inventory of stock certificates in Ruby's safe deposit box #18; (6) account holdings as of March 31, 2006; (7) statement of transactions, by date; (8) monthly account statements from TD Waterhouse, showing investment by stock and market value; (9) monthly account statements from Wachovia Securities, showing investment by stock and market value; and (10) the blue book value for Ruby's 1999 Chevrolet Malibu."

¶ 23    On May 4, 2006, Busey served a copy of the petition and accounting on Bequette as well as on the attorneys for Ruth, Lawrence, and Ruby Kanfer. On May 11, 2006, Busey served upon them a notice of hearing. The notice informed them that the hearing on the account was scheduled for May 26, 2006.

¶ 24    The trial court held the scheduled hearing. Finding that the account "show[ed] Mrs. Kanfer's original and current assets, holdings, and expenditures made on her behalf," the court approved the account, without objection by any party. Bequette and the attorneys for Ruth, Lawrence, and Ruby Kanfer added their signatures to the court's order, approving it as to form.

¶ 25                                    2. The Second Accounting

¶ 26    On January 29, 2007, Busey filed its second accounting, which covered the period of April 1, 2006, to December 31, 2006. Busey served a copy of the accounting, over 300 pages long, on Bequette, on the attorneys for Ruth and Lawrence Kanfer, and on Ruby Kanfer personally. (On November 15, 2006, the trial court granted Pavia permission to withdraw from representing Ruby Kanfer. An attorney named Weaver replaced Pavia, and on December 18, 2006, to quote from the docket entry for that date, "[s]tipulation for the withdraw[al] of Mr. Weaver as counsel for Ms. Kanfer [was] entered." The court directed that until it ordered otherwise, all notices were to be sent to Ruby Kanfer personally at her Urbana address.)

¶ 27    On March 29, 2007, Busey served a notice of hearing on Bequette, on the attorneys for Ruth and Lawrence Kanfer, and on Ruby Kanfer. The notice informed them that a hearing on the second account was scheduled for April 10, 2007.

¶ 28    As before, Moore prefaced the account with a verified narrative. She explained that during 2006 Busey succeeded in transferring and consolidating most of Ruby Kanfer's accounts into the "Main Street Wealth Management Account." Because her accounts held "over 340 equity positions," evaluating the individual investments would be time-consuming. Busey decided "not [to] start this process until the consolidation was completed in order to have the work be part of the percentage fee that [was] charged, rather than billed at an hourly rate." As before, Busey was holding a greater than normal amount of Ruby Kanfer's assets in cash because of the possibility that the Fred Kanfer trusts would have to be funded.

¶ 29    Again, we quote from Busey's brief for a description of the documentation attached to Moore's narrative, a description that plaintiffs do not appear to dispute:

        "Attached to Moore's narrative were documents identifying: (1) the Estate Summary as filed May 25, 2006 (including the identity of banks where funds were located and the type of asset held (i.e. checking account, savings account, IRA, bonds)); (2) the Estate Summary as of December 31, 2006 (including the identity of

banks where funds were located and the type of asset held); (3) disbursements paid from, deposits into, and interest earned on, various accounts by account and date; (4) account statement for account #1025000015 as of December 31, 2006; (5) statement of transaction for account #31 00 4827 06 4; (6) asset schedule between July 1, 2006 and December 31, 2006 in account 1025000015; (7) account statement for account #1060001119 as of December 31, 2006; (8) statement of transactions, by date for account 14 01 4827 06 8; (9) asset schedule between July 1, 2006 and December 31, 2006 in account 10600001119; (10) credit union account and interest from that account; (11) monthly account statements from TD Waterhouse, showing investment by stock and market value; (12) account statements from Wachovia Securities, showing investment by stock and market value; and (13) the blue book value for Ruby's 1999 Chevrolet Malibu."

¶ 30    On April 10, 2007, the trial court held the scheduled hearing on the second accounting. Bequette, Lawrence Kanfer, Ruby Kanfer, and the attorneys for Lawrence and Ruth Kanfer attended the hearing. Finding that "[t]he Report show[ed] Ms. Kanfer's original and current asset holdings and expenditures made on her behalf," the court approved the report. Bequette was the only person who signed the court's order under the language "Approved as to Form." Next to his signature, he wrote: "Mrs. Kanfer objected after I discussed it with her. I do not object."

¶ 31    Ruby Kanfer died on November 7, 2007, whereupon the guardianships ended (see *In re Estate of Gebis*, 186 Ill. 2d 188, 193 (1999)).

¶ 32                              3. The Final Accounting

¶ 33    On December 10, 2007, Busey filed its final accounting.

¶ 34                              C. The Petitions for Fees

¶ 35    From May 2005 to June 2007, Busey periodically petitioned the trial court for permission to collect its attorney fees, guardianship fees, and costs from the ward's estate. Specifically, Busey filed the following petitions.

¶ 36    On May 11, 2005, Busey's attorney filed a petition for fees and costs in the amount of $10,620.25. On June 1, 2005, the trial court held a hearing on this petition. Bequette and the attorneys for Ruth, Lawrence, and Ruby Kanfer attended the hearing. No one objected to the petition, and the court approved it.

¶ 37    On July 22, 2005, Busey's attorney filed a petition for attorney fees and costs in the amount of $6,948 and for guardianship fees and costs in the amount of $9,295, which included the hourly fees that a contractor, Philip Hoggatt, had been charging for making repairs to Ruby Kanfer's condominium in Champaign. On August 5, 2005, the trial court held a hearing on this petition. Bequette and the attorneys for Ruth, Lawrence, and Ruby Kanfer attended the hearing. No one objected to this petition, and the court approved it.

¶ 38    On September 15, 2005, Busey's attorney filed a petition for attorney fees and costs in the amount of $2,409.50 and for guardianship fees and costs in the amount of $5,683.75, which

again included the expense of Hoggatt's work. On October 27, 2005, the trial court held a hearing on this petition. Bequette as well as Ruth Kanfer, Lawrence Kanfer, Ruby Kanfer, and their attorneys attended the hearing. No one objected to the petition, and the court approved it.

¶ 39 On October 25, 2005, Busey's attorney filed a supplemental petition for attorney fees and costs and a supplemental petition for guardian fees and costs. He served these supplemental petitions on Bequette as well as on the attorneys for Ruth, Lawrence, and Ruby Kanfer. On November 10, 2005, the trial court entered an order granting these petitions. This order noted that in the hearing of October 27, 2005, the court reserved ruling on the supplemental petitions and gave the parties five days to file any objection to them. Because no objection was filed, the court granted the supplemental petitions.

¶ 40 On January 4, 2006, Busey's attorney filed a petition for attorney fees and costs in the amount of $3,738.50 and a petition for guardian fees and costs in the amount of $7,873.80. On January 20, 2006, the trial court held a hearing on these petitions. Bequette, Ruby and Lawrence Kanfer, and the attorneys for Ruby, Lawrence, and Ruth Kanfer attended the hearing. Without objection by any party, the court approved the petitions.

¶ 41 On May 11, 2006, Busey's attorney filed a petition for attorney fees and costs in the amount of $7,360 and a petition for guardian fees and costs in the amount of $14,342.71, which included the expense of Hoggatt's work. On May 26, 2006, the trial court held a hearing on these petitions. Bequette as well as Ruby Kanfer, Lawrence Kanfer, Ruth Kanfer, and their attorneys attended the hearing. No one objected to the petitions, and the court approved them.

¶ 42 On July 11, 2006, Busey's attorney filed a petition for attorney fees and costs in the amount of $4,700 and a petition for guardian fees and costs in the amount of $5,757.75. These petitions were served on Bequette and on the attorneys for Ruby, Lawrence, and Ruth Kanfer. By their signatures, the attorneys signified their assent to the petitions, which the trial court approved on July 21, 2006.

¶ 43 On November 9, 2006, Busey's attorney filed an amended petition for attorney fees and costs in the amount of $5,512.50 (the original petition requested $2,432.50). On November 15, 2006, the trial court held a hearing on the amended petition. Bequette, Ruby Kanfer, Lawrence Kanfer, and the attorneys for Ruby, Lawrence, and Ruth Kanfer attended the hearing. No one objected to the amended petition, and the court approved it.

¶ 44 On February 5, 2007, Busey's attorney filed a petition for attorney fees and costs in the amount of $7,579.55, and on February 7, 2007, the firm of Erwin, Martinkus, and Cole filed a petition for attorney fees in the amount of $5,964 for tax advice it had provided. At this time, Ruby Kanfer had no personal attorney, although there still was a guardian *ad litem*, Bequette. On April 10, 2007, the trial court held a hearing on the petitions. Bequette, Ruby Kanfer, Lawrence Kanfer, and the attorneys for Ruth and Lawrence Kanfer attended the hearing. No one objected to the petitions, and the court approved them.

¶ 45 On June 12, 2007, Busey's attorney filed a petition for attorney fees and costs in the amount of $1,785. He served a notice of the hearing on Bequette, Ruby Kanfer, and the attorneys for Ruth and Lawrence Kanfer. On June 26, 2007, the trial court held a hearing on the petition. Bequette and the attorneys for Ruth and Lawrence Kanfer attended the hearing. No

one objected to the petition, and the court approved it.

¶ 46                    D. The Second Amended Petition for Surcharge

¶ 47       On January 27, 2011, plaintiffs, in their capacity as coexecutors of Ruby Kanfer's will, filed a second amended petition for surcharge against Busey. In paragraph 4(C) of the second amended petition, plaintiffs alleged that Busey should be surcharged (that is, should have to pay damages) because Busey (1) failed to implement an investment model that it had proposed for the ward's estate; (2) allowed $2 million to remain in a Goldman Fed Fund; (3) failed to place cash equivalents in a tax-exempt fund; (4) allowed $900,000 to remain in investments made by Ruby Kanfer; (5) left two condominiums, one in Florida and the other in Champaign, in a condition of disrepair; (6) collected hourly charges for Hoggatt's work on the Champaign condominium while simultaneously collecting a management fee of 0.85%; and (7) collected a management fee of 0.85% for managing IRA funds while doing nothing at all with them.

¶ 48       Plaintiffs took Bequette's deposition. An attorney asked him:

"Q. The bank was appointed as permanent plenary guardian of the estate with the exception of the trading account that Ruby held. Correct?

A. Yes.

Q. And you're indicating that you were aware that the bank had a model for investments, in other words, the type of stocks and funds that it would hold in an account of this size. Is that correct?

A. Yes.

Q. And that the bank did not proceed to change the investments from where Ruby had started, basically, into its model?

A. I believe some changes were made. I believe Ruby was angry and upset with all of them. There may even be times when Joe Pavia tried to raise some of them to the court, but you're absolutely correct. The bank never completely got Ruby's assets into their model.

Q. Was this ever presented to the court in any report or request for directions from the court?

A. Not that I remember.

Q. Not from you, not from the bank?

A. No, although I can't speak for the bank. I wouldn't have made that recommendation because I did not believe that this was the case where the goal was let's make Ruby Kanfer as much money as possible.

This was the case of let's let Ruby maintain her dignity and have her preferences as much as they are feasible, and I think that's what the Probate Act says, and I don't believe that by the time they're passed away there was ever an instance where Ruby ever wanted for anything because she didn't have enough money."

¶ 49       On February 25, 2011, Busey filed a motion to dismiss the second amended petition as legally insufficient (735 ILCS 5/2-615 (West 2012)) and as barred by an affirmative matter

- 8 -

(735 ILCS 5/2-619(a)(9) (West 2012)). See 735 ILCS 5/2-619.1 (West 2012) (combined motions).

¶ 50 The trial court entered a memorandum of opinion on August 22, 2011. On September 12, 2011, Busey filed a motion for clarification and reconsideration. On November 19, 2012, the court issued an amended memorandum of opinion, and on January 8, 2013, it issued another order of clarification. Ultimately, the court granted Busey's motion in part and denied it in part, striking some but not all the paragraphs of the second amended petition. The paragraphs stricken pursuant to section 2-615 were stricken with prejudice. Certain other paragraphs were stricken pursuant to section 2-619. The court made a finding pursuant to Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010).

¶ 51 This appeal followed.

¶ 52                                    II. ANALYSIS
¶ 53            A. The Discrepancy Between the Issues That Plaintiffs Raise in Their
                  Brief and the Relief That They Seek at the Conclusion of Their Brief
¶ 54 In their brief, plaintiffs raise two issues:

"1. Whether the accounts approved during pending guardianship foreclose all issues that might be raised at the time of the filing of the accounting and prior thereto.

2. Whether participation in guardianship proceeding as Guardian of the Person binds individuals later acting as decedent's Coexecutors in regard to approval of accounts filed by Guardian of the Estate."

Essentially, plaintiffs challenge the preclusive effect of the accounts approved by the trial court.

¶ 55 But the approved accounts were not the only reason why the trial court dismissed (or struck) paragraphs of the second amended petition. Some dismissals were pursuant to section 2-615, for failure to state a cause of action. Other dismissals were pursuant to section 2-619, and the affirmative matter was not all the same. The two issues quoted above are relevant to only *some* of the dismissals: the section 2-619 dismissals in which the affirmative matter was the approved accounts. See 735 ILCS 5/2-619(a)(4) (West 2012) ("[T]he cause of action is barred by a prior judgment.").

¶ 56 Even though the issues that plaintiffs raise in their brief are irrelevant to the dismissals pursuant to section 2-615 and to the dismissals pursuant to section 2-619 that were based on an affirmative matter other than the approved accounts, plaintiffs, in the conclusion of their brief, request the reversal of the trial court's order in its entirety. They do not identify the particular dismissed paragraphs that correspond to the issues they raise. They just request a reversal *in toto*. See Ill. S. Ct. R. 341(h)(8) (eff. July 1, 2008) ("A short conclusion stating the *precise* relief sought ***." (Emphasis added.)).

¶ 57 Given the inexplicably broad relief that plaintiffs request, it is necessary for us to specify, on the one hand, the dismissals to which they have forfeited any challenge (see Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008) ("Points not argued are waived," that is, forfeited.)) and to specify,

on the other hand, the dismissals that are implicated by the issues they raise in their brief.

¶ 58                                      1. The Forfeited Paragraphs

¶ 59         The trial court dismissed paragraphs 3(A) to (D) of the second amended petition for failing to allege any damages. These dismissals were pursuant to section 2-615, and plaintiffs have forfeited any challenge to them.

¶ 60         The trial court dismissed paragraphs 3(E) and (F) and 5(P) because they sought compensation for the coexecutors' time, which, the court held, was not a compensable item in this proceeding. These dismissals were pursuant to section 2-615, and plaintiffs have forfeited any challenge to them.

¶ 61         The trial court dismissed paragraph 4(B) because it was inconsistent with a prior verified pleading. See *Montgomery Ward & Co*. *v. Wetzel*, 98 Ill. App. 3d 243, 251 (1981) ("Once an admission is made in a verified pleading, it remains binding upon the pleader even after a superseding amendment unless the amendment discloses that the earlier admissions were made through mistake or inadvertence."). Supposedly, the dismissal of this paragraph was pursuant to section 2-615, but perhaps section 2-619(a)(9) (735 ILCS 5/2-619(a)(9) (West 2012)) was the applicable section, considering that the prior verified pleading was a matter outside the four corners of the second amended petition. See *Krueger v. Lewis*, 342 Ill. App. 3d 467, 471-72 (2003). In any event, plaintiffs have forfeited any challenge to this dismissal.

¶ 62         The trial court dismissed paragraphs 4(C)(1)(ii) and (1)(iv) for failure to plead specific damages. These dismissals were pursuant to section 2-615, and plaintiffs have forfeited any challenge to them.

¶ 63         The trial court dismissed paragraph 4(C)(1)(iii) because it conflicted with exhibit B of the second amended petition. See *Holubek v. City of Chicago*, 146 Ill. App. 3d 815, 817 (1986) ("A [section] 2-619 motion to dismiss admits all facts well pleaded as well as all reasonable inferences therefrom favorable to plaintiff. However, if an exhibit is attached to the complaint, the exhibit controls and a motion to dismiss does not admit allegations in conflict with facts disclosed in the exhibit."). Plaintiffs have forfeited any challenge to this dismissal.

¶ 64         The trial court dismissed paragraph 5(H) to the extent that it sought compensation for "other related items of damages." The reason for this dismissal was that plaintiffs had pleaded no specific facts. This dismissal was pursuant to section 2-615, and plaintiffs have forfeited any challenge to it.

¶ 65                                      2. The Relevant Paragraphs

¶ 66         We infer that paragraphs 4(C)(1)(i), (1)(v), (1)(vi), (1)(vii), and 6 of the second amended petition are the paragraphs under consideration in this appeal, since the trial court dismissed them pursuant to section 2-619, on the ground that the approved accounts barred them. See 755 ILCS 5/24-11(b) (West 2012). These paragraphs read as follows:

> "4. In violation of its fiduciary duties to Ruby Kanfer, the Guardian of the Estate failed to properly manage Ruby's investments and tax liability in the following respects:

* * *

C. Main Street Bank & Trust Company agreed to accept the appointment as Permanent Guardian of the Estate of Mrs. Ruby Kanfer under the following conditions:

1. All financial assets must be transferred to an account that will be established at [M]ain Street Wealth Management. A separate account for IRAs will be established at Main Street Wealth Management. Stocks, bonds, mutual funds and Real Estate Investment Trusts would be transferred in kind to these accounts. Evaluation will be made by the Main Street Wealth Management Investment Team as to the best practice to get to the agreed upon asset allocation. Financial soundness of current holdings, in conjunction with tax considerations and appropriateness for Mrs. Ruby Kanfer's current and long term financial needs will dictate whether or not specific investments already in place will be kept. All future investment decisions would be made by Main Street Wealth Management in accordance with established criteria.

Following its appointment in May 2005 by the Court as Permanent Plenary Guardian of Estate, this Court authorized payment for management of assets at .85%.

(i) A full and complete examination of the assets and their investments reflect that although an investment model was established by the Guardian in preparation for the hearing on the Petition for Termination of Guardianship in July 2006, a copy of which is attached at *Exhibit A*, and although sound fiduciary principles require a diversification in a conservative portfolio pursuant to the Prudent Investor Rule as reflected in this investment model, the Guardian of the Estate took no action to implement any investment model on the Guardianship of Ruby Kanfer;

* * *

(v) Leaving two significant parcels of real estate–one in Champaign, Illinois, and one in the State of Florida–in various states of repair [*sic*] without even inspecting on site the Florida condominium which it had been placed on notice had incurred significant property damage, a copy of which is attached hereto as *Exhibit C*, and yet continued to assess and obtain .85% fee for management over said properties;

(vi) Collecting in addition to the .85% for Champaign property hourly charges for Philip Hoggatt for work on said property, and;

(vii) collecting the .85% fee for management of the IRA funds in which the investments remained in the same 30 stocks which had been selected by the Ward over the period of the Guardianship.

* * *

6. Paragraph N of the Order entered October 27, 2005, provides that:

The Guardian is ordered to file an annual report with the Clerk's office and

- 11 -

serve it upon all parties and the Guardian *ad Litem* containing the following:

Guardian of the Estate: verified accounting of the estate

(a) Assets. List any asset and property, including bank accounts; where located, value, type of account, any trusts, real estate or personal property of value;

(b) Income. List any income and its source, including interest earned.

(c) Expenditures. List any disbursements and property disposed of, value, date, nature of transaction, parties involved, and reason for expenditure.

Attach all copies of any relevant supporting documents. Said report is to be filed no later than May 4, 2006 and a like month and day of each year thereafter, with a copy to all parties and Guardian *ad Litem*.

Each of the interim Orders address approval of hours and in regard to periodic accountings, approval of original and current asset holdings, expenditures made on her behalf. The Reports and Accounts or other court pleadings or transcripts do not reflect any examination or disclosure within the reports or accountings as to property management, investment management, and are a strict approval of the accuracy of receipts and disbursements. They are limited to that specific approval. These interim Orders do not address the propriety of the investments or investment strategy or the property management or the property management strategy.

The Guardian *ad Litem* confirms the limited scope of review and exclusion from the Court and parties as to investment property management in the attached statements made in his discovery deposition, attached hereto as *Group Exhibit F*.

Ruth Kanfer was present solely as Guardian of the Person. Coexecutors also currently represent the grandchildren of Ruby Kanfer who were not present in the guardianship.

The Guardian had an investment model, the Guardian had a significant property damage report and willfully failed to disclose these documents from [*sic*] the Court and the parties.

By virtue of all of the aforesaid breach of fiduciary duties by the Guardian of the Estate, the Guardian of the Estate has collected fees for services that have not been rendered and to which [it] is not entitled to be paid, said fees in the approximate amount of $108,873.00."

¶ 67    These paragraphs, quoted immediately above, raise essentially four claims: (1) Busey collected management fees that it had not earned, (2) Busey collected hourly charges for Hoggatt's work on the Champaign property while simultaneously collecting the management fees, (3) Busey failed to implement an investment model, and (4) Busey failed to make repairs to real estate. We will discuss each of these claims in turn, considering to what extent each is barred by the prior judgments in the accounting proceedings. See 735 ILCS 5/2-619(a)(4)

(West 2012); 755 ILCS 5/24-11(b) (West 2012); Ill. S. Ct. R. 304(b)(1) (eff. Feb. 26, 2010).

¶ 68                                     B. The Management Fees

¶ 69        Section 24-11(a) of the Probate Act (755 ILCS 5/24-11(a) (West 2012)) requires a guardian to file an annual account, interim accounts, and a final account. Section 24-11(b) says that once the trial court approves an annual account or interim account ("any account except the final account"), the account is binding on the ward if a guardian *ad litem* represented the ward in the hearing on the account and if 10 days' advance notice of the hearing was given.

¶ 70        Sections 24-11(a) and (b) read as follows:

> "(a) The representative of a ward's estate shall present a verified account of his administration to the court which issued his letters within 30 days after the expiration of one year after the issuance of letters or within such further time as the court allows; within 30 days after the termination of his office or within such further time as the court allows, and whenever required by the court until the office is terminated; provided however, if no time is set by the court, the representative shall present a verified account within 30 days after the expiration of 3 years from the date of the preceding account or within such further time as the court allows. The account shall state the receipts and disbursements of the representative since his last accounting and all personal estate which is on hand, and shall be accompanied by such evidence of the disbursements as the court may require. On every accounting the court may require the representative to produce satisfactory evidence that he has in his possession or control the personal estate shown by the account to be on hand.

> (b) If the estate of a ward is derived in whole or in part from payments of compensation, adjusted compensation, pension, insurance or other similar benefits made directly to the estate by the Veterans Administration, notice of the hearing on any account filed in the ward's estate and a copy of the account must be given to the Veterans' Administration Regional Office at least 10 days before the hearing. If notice of the hearing on any account except the final account of a representative is served at least 10 days before the hearing on the account and the court appoints a guardian ad litem to represent the ward at the hearing, in the absence of fraud, accident or mistake the account as approved is binding upon the ward. Notice of the hearing on any final account of a representative must be given to the ward if he is living and to such other persons and in such manner as the court directs." 755 ILCS 5/24-11(a), (b) (West 2012).

¶ 71        The management fees are indeed "disbursements" within the meaning of section 24-11(a) (755 ILCS 5/24-11(a) (West 2012)). But whenever Busey requested authorization to charge these fees, it did so in a hearing on a petition for fees, not in a hearing on an account. The fees were not in the accounts but instead were in separate fee petitions. And the fee petitions themselves were not accounts. An account states not only the disbursements but also the receipts and the personal estate on hand. 755 ILCS 5/24-11(a) (West 2012). The fee petitions did not address the latter two items and hence were not accounts. By approving the accounts, the trial court did not approve the management fees, because, again, the management fees were

- 13 -

not in the accounts; they were in the fee petitions, specifically the petitions for guardianship fees. Therefore, section 24-11(b) is, by its terms, inapplicable to the management fees.

¶ 72    In its motion for dismissal, however, Busey invoked not only section 24-11(b) but also Rule 304(b)(1). By invoking Rule 304(b)(1) and by pointing out the lack of any appeal pursuant to that rule, Busey effectively raised the common-law defense of *res judicata* (see *Baird & Warner, Inc. v. Gary-Wheaton Bank*, 122 Ill. App. 3d 136, 138-39 (1984); *State Farm Illinois Federal Credit Union v. Hayes*, 92 Ill. App. 3d 1127, 1128 (1981)).

¶ 73    Rule 304(b)(1) provides in part as follows:

  "The following judgments and orders are appealable without the finding required for appeals under paragraph (a) of this rule:

    (1) A judgment or order entered in the administration of a[ ] *** guardianship *** which finally determines a right or status of a party." Ill. S. Ct. R. 304(b)(1) (eff. Feb. 26, 2010).

¶ 74    Busey was a party in the guardianship proceeding, and the orders granting the petitions for guardianship fees finally determined Busey's right to the management fees. It follows that under Rule 304(b)(1), each of the orders granting management fees was immediately appealable without a finding pursuant to Rule 304(a). See *In re Trusts of Strange*, 324 Ill. App. 3d 37, 42 (2001); *Lampe v. Pawlarczyk*, 314 Ill. App. 3d 455, 469-70 (2000); *In re Estate of Kime*, 95 Ill. App. 3d 262, 268 (1981).

¶ 75    Not only was there a guardian *ad litem*, but the ward also was personally represented by an attorney throughout the period when Busey petitioned for management fees. Her attorney attended every hearing in which the trial court granted management fees, and the ward never appealed from any of the orders granting management fees. (In the hearings of April 10 and June 26, 2007, when Ruby Kanfer lacked a personal attorney, the trial court heard petitions only for attorney fees and costs, not management fees. In any event, Bequette, the guardian *ad litem*, attended all hearings on fee petitions, including the hearings on management fees.) Each of these orders is more than 30 days old. See Ill. S. Ct. R. 303(a)(1) (eff. June 4, 2008). Therefore, we must consider whether *res judicata* bars the present challenge to the management fees. See *Baird*, 122 Ill. App. 3d at 138-39; *State Farm*, 92 Ill. App. 3d at 1128.

¶ 76    *Res judicata* has three elements (1) a court of competent jurisdiction rendered a final judgment on the merits, (2) the cause of action in the present proceeding is the same as the cause of action in the previous proceeding, and (3) the party asserting *res judicata* and the party against whom *res judicata* is asserted were parties to the previous action in which the judgment was entered, or else they are in privity with parties to the previous action. *River Park, Inc. v. City of Highland Park*, 184 Ill. 2d 290, 302 (1998); 23A Ill. L. and Prac. *Judgments* § 220 (2008).

¶ 77    We have held that an order described in Rule 304(b) is a final judgment for purposes of *res judicata*. *State Farm*, 92 Ill. App. 3d at 1128; see also *Piagentini v. Ford Motor Co.*, 387 Ill. App. 3d 887, 893-94 (2009) ("A final order is one which either terminates the litigation between the parties on the merits or disposes of the rights of the parties, either on the entire controversy or a separate branch thereof." (Internal quotation marks omitted.)). The orders

granting management fees were orders described in Rule 304(b)(1) and hence were final judgments for purposes of *res judicata*. See *State Farm*, 92 Ill. App. 3d at 1128. The trial court's jurisdiction is unquestioned. Therefore the first element of *res judicata* is fulfilled. See *River Park*, 184 Ill. 2d at 302.

¶ 78    As for the second element of *res judicata*, the cause of action is the same: Busey's entitlement to management fees. See *id.*

¶ 79    As for the third element, the parties are not the same. See *id.* In the hearings on the fee petitions, Lawrence Kanfer appeared in his individual capacity, and Ruth Kanfer appeared as the ward's personal guardian, not as the guardian of her estate. "A party appearing in an action in one capacity, individual or representative, is not thereby bound by or entitled to the benefits of the rules of res judicata in a subsequent action in which he appears in another capacity." Restatement (Second) of Judgments § 36(2) (1982). Because plaintiffs were neither guardians of the estate nor guardians *ad litem*, and because they had no vested interest in the ward's property while she was alive, they lacked standing to object to the management fees or to any other disposition of the ward's property. See *In re Estate of Henry*, 396 Ill. App. 3d 88, 94 (2009); *In re Guardianship of Austin*, 245 Ill. App. 3d 1042, 1047 (1993); *In re Guardianship of Walkup*, 799 P.2d 145, 146-47 (Okla. Civ. App. 1990). Considering that, in the previous proceeding, plaintiffs lacked standing to speak on the question of Busey's entitlement to fees, they cannot fairly be regarded as the *same parties* in the two proceedings. See *Henry*, 396 Ill. App. 3d at 99-100.

¶ 80    The ward, however, was a party to the proceedings in which the trial court approved the management fees, and plaintiffs, as the ward's coexecutors, are in privity with the ward. See *River Park*, 184 Ill. 2d at 302; *People ex rel. James v. Seaman*, 239 Ill. 611, 615 (1909). As coexecutors, plaintiffs stand in her shoes. See *People v. Continental Illinois National Bank & Trust Co. of Chicago*, 360 Ill. 454, 458 (1935). Therefore, we find all three elements of *res judicata* to be fulfilled, and in our *de novo* review (*Halverson v. Stamm*, 329 Ill. App. 3d 1206, 1215 (2002)), we hold that *res judicata* now bars plaintiffs, as the ward's coexecutors, from recovering the management fees. See 735 ILCS 5/2-619(a)(4) (West 2012); *Baird*, 122 Ill. App. 3d at 138-39; *State Farm*, 92 Ill. App. 3d at 1128.

¶ 81                     C. The Hourly Charges for Hoggatt's Work

¶ 82    This reasoning also applies to the hourly charges for Hoggatt's work. In the same petitions in which Busey sought permission to collect its management fees out of the ward's estate, it sought permission to pay Hoggatt out of the ward's estate for the work he had done on the Champaign property.

¶ 83    Presumably, Busey itself was contractually obligated to Hoggatt. Busey had no power to bind the ward's estate to a contract with Hoggatt or any other third party. See *In re Estate of Wagler*, 217 Ill. App. 3d 526, 530 (1991). Whenever a guardian enters into a contract with a third party, the contract personally binds the guardian–even if the contract is for the ward's benefit and even if the contract identifies the guardian as the ward's representative. *Id.* at 529-30. The guardian can only hope that the trial court will grant permission to pay the

- 15 -

contractual obligation out of the ward's estate. See *Cheney v. Roodhouse*, 135 Ill. 257, 265-66 (1890); *Parsons v. Estate of Wambaugh*, 110 Ill. App. 3d 374, 378 (1982). (A guardian averse to this risk can seek judicial approval ahead of time, before incurring the contractual obligation (*id.*), or, if possible, the guardian can obtain the third party's agreement to look only to the estate for payment (*Wagler*, 217 Ill. App. 3d at 529).)

¶ 84　　It follows that when the trial court approved the petitions containing Hoggatt's hourly charges, the court effectively granted indemnity to Busey out of the ward's estate. See *id.* In that respect, the orders determined a right of a party to a guardianship proceeding–namely, Busey's right to indemnity–and thus the orders were immediately appealable under Rule 304(b)(1). Because the ward never appealed from any of these orders, *res judicata* now bars plaintiffs, as the ward's coexecutors and privies, from recovering the charges for Hoggatt's work. See 735 ILCS 5/2-619(a)(4) (West 2012); *Baird*, 122 Ill. App. 3d at 138; *State Farm*, 92 Ill. App. 3d at 1128.

¶ 85　　　　　　　　　D. Busey's Failure To Implement the Investment Model

¶ 86　　In paragraph 4(C)(1)(i) of their second amended petition, plaintiffs allege that even though Busey prepared an investment model for the ward's assets and even though "sound fiduciary principles require[d] a diversification in a conservative portfolio pursuant to the Prudent Investor Rule as reflected in this Investment Model," Busey never implemented the investment model. Likewise, in paragraph 4(C)(1)(vii), plaintiffs allege that "the IRA funds" have "remained in the same 30 stocks *** selected by the Ward."

¶ 87　　We take these factual allegations to be true, and because the remedy clause of the second amended petition seeks $444,390.67–a sum greater than merely the $108,873 in management fees–we will infer that the failure to implement the investment model caused financial harm to the ward's estate over and above the allegedly unearned management fees (which, we have held, *res judicata* bars plaintiffs from recovering). See *Fink v. Banks*, 2013 IL App (1st) 122177, ¶ 18.

¶ 88　　The question, then, is whether plaintiffs are barred from seeking compensation for other financial harm as well, over and above the management fees: the loss of opportunities to earn income, the diminishment of principal, or the increased tax liability (whatever the case may be) that resulted from Busey's alleged failure to implement the investment model.

¶ 89　　Again, we refer to the three elements of *res judicata*, starting with the first element: the rendition of a final judgment on the merits by a court of competent jurisdiction (*River Park*, 184 Ill. 2d at 302). Each order approving an account was appealable under Rule 304(b)(1). See *In re Estate of Neisewander*, 130 Ill. App. 3d 1031, 1033 (1985). Each time a court of competent jurisdiction issued such an order, it issued a final judgment on the merits for purposes of *res judicata*. See *State Farm*, 92 Ill. App. 3d at 1128. (More precisely, each judgment became final when the possibility of appellate review was exhausted. See *Fidelity National Title Insurance Co. of New York v. Westhaven Properties Partnership*, 386 Ill. App. 3d 201, 211 (2007).) Therefore, the first element of *res judicata* is fulfilled.

- 16 -

¶ 90    The second element of *res judicata* is that the cause of action in the first proceeding is the same as the cause of action in the previous proceeding. *River Park*, 184 Ill. 2d at 302. The accounts presented, on their face, the same "group of [operative] facts" that was before the trial court in this action, namely, the discrepancy between the investment model and the investments that Busey still was holding. *Id.* at 310. *Res judicata* bars not only claims that were raised in the previous action but also claims that, in the exercise of due diligence, could have been raised in the previous action. *Kasny v. Coonen & Roth, Ltd.*, 395 Ill. App. 3d 870, 874 (2009). In the hearings on the accounts, nothing prevented Bequette or the ward's attorney from objecting to Busey's evident failure to implement the investment model. For them to be able to do that, they would not have had to perform an exhaustive, in-depth analysis of the ward's financial affairs. According to plaintiffs, Bequette spent little time examining the accounts; and yet, in his deposition, he testified he had been aware "the bank had a model for [the ward's] investments" and that "[t]he bank never completely got [her] assets into their model." It seems, then, that he did not have to perform a long, elaborate audit to become aware of those facts. Therefore, the second element of *res judicata* is fulfilled: the causes of action are the same in that the present claim of failure to implement the investment model could have been raised in the accounting proceedings. See *River Park*, 184 Ill. 2d at 302; *Kasny*, 395 Ill. App. 3d at 874.

¶ 91    The third and final element of *res judicata* is an identity of the parties. See *River Park*, 184 Ill. 2d at 302. As we have explained, the ward was a party to the accounting proceedings, and plaintiffs are in privity with her because they are her coexecutors. See *Continental*, 360 Ill. at 458; *Seamen*, 239 Ill. at 615. It follows that *res judicata* bars plaintiffs from raising the claim of Busey's failure to implement the investment model. See *In re Estate of Hunter*, 775 N.Y.S.2d 42, 45 (N.Y. App. Div. 2004).

¶ 92                          E. Approvals of Annual and Interim Accounts
                        Are No Longer "*Ex Parte*" and "*De Bene Esse*"

¶ 93    Plaintiffs cite *Marshall v. Coleman*, 187 Ill. 556, 569 (1900), for the proposition that "a partial or annual account is only a judgment *de bene esse* [([a]s conditionally allowed for the present (Black's Law Dictionary 408 (7th ed. 1999)))], often rendered *ex parte*, and only *prima facie* correct." (Internal quotation marks omitted.)

¶ 94    This holding in *Marshall* is inapplicable because in 1900, when the supreme court decided *Marshall*, there was no statute analogous to section 24-11(b) of the Probate Act (755 ILCS 5/24-11(b) (West 2012)). Before the enactment of the Probate Act, "interim accounts could be set aside or modified at the final accounting" (*In re Estate of Aschauer*, 188 Ill. App. 3d 63, 68 (1989)) because no hearing on an interim account was required; all the representative had to do was file interim accounts, and notice, hearing, and approval were reserved for the final account (1871-72 Ill. Laws 77 (§ 112)). Now section 24-11(b) provides for notice, hearing, and approval whenever the representative files an annual account or an interim account. Therefore, in *Aschauer* (a case plaintiffs do not cite), we expressly declined to follow the older, superseded cases that regarded interim accounts as nonbinding. In the present state of the law, "the approval of an account by the court is binding on all parties who had notice and is *res*

- 17 -

*judicata*." *Aschauer*, 188 Ill. App. 3d at 68. We adhere to *Aschauer* and decline to follow the contrary holdings in *In re Estate of Berger*, 166 Ill. App. 3d 1045, 1064 (1987) (First District), and *In re Estate of Moeller*, 133 Ill. App. 2d 327 (1971) (abstract of op.) (First District).

¶ 95　　　　　　　　　　F. The Right Under Section 24-18
　　　　　　　　To Initiate an Action for Mismanagement of the Estate

¶ 96　　　Plaintiffs argue that under section 24-18 of the Probate Act (755 ILCS 5/24-18 (West 2012)), they have a right, as successor representatives, to "institute and maintain an action against the [previous] representative," Busey, "for all money and property which may have come into [its] possession and *** may have been wasted *** or misapplied and no satisfaction made therefor."

¶ 97　　　We must give effect, however, to both section 24-18 and section 24-11(b) (see *Chavda v. Wolak*, 188 Ill. 2d 394, 402 (1999)), and section 24-11(b) provides an affirmative defense to an action for mismanagement of an estate if, in a hearing on an annual or interim account, preceded by 10 days' notice, the trial court approved the alleged mismanagement of the estate and there was no "fraud, accident or mistake." 755 ILCS 5/24-11(b) (West 2012). Also, section 24-18 is subject to the common-law doctrine of *res judicata*, considering that, under section 2-619(a)(4) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(4) (West 2012)), a defendant may move to dismiss an action on the ground that "the cause of action is barred by a prior judgment."

¶ 98　　　　　　　G. The Suggested Impracticality of Examining
　　　　　　　the Annual and Interim Accounts as They Are Filed

¶ 99　　　Plaintiffs are concerned that if we interpret section 24-11(b) as barring their actions, the measures guardians *ad litem* will have to take to avoid waiver or estoppel will make accounting proceedings extremely complicated and cumbersome. They write:

>　　　"To deem that every current account must be fully examined and fully litigated with complete examination of investment, taxes, property management and all relevant issues raised and litigated at the time of each annual account of a guardianship will place an unbelievable challenge on the time of the courts and place significant additional fees and costs on the ward. What guardian *ad litem* could ever *not* proceed to fully and completely analyze each accounting and all actions of the guardian of the estate whether reflected in the account or purposely concealed from the Court or the guardian *ad litem*?" (Emphasis in original.)

¶ 100　　We do not say that, in an accounting proceeding, the guardian *ad litem* must perform a wide-ranging audit of the ward's financial affairs (a "complete examination of investment, taxes, property management"). We merely say the guardian *ad litem* should read the account and if there is anything questionable or enigmatic on the face of the account, the guardian *ad litem* should object. All the guardian *ad litem* has to do is object to whatever is potentially problematic in the account, and the objection will cast the burden on the guardian of the estate to prove that the objected-to item is "just and proper." *Altieri v. Estate of Snyder*, 262 Ill. App.

3d 427, 434 (1992). The position of guardian *ad litem* in an accounting proceeding is not *pro forma*. The guardian *ad litem* is supposed to represent the best interests of the ward rather than accede to whatever the ward wants. *In re Guardianship of Mabry*, 281 Ill. App. 3d 76, 88 (1996). If the estate is large and complicated, the trial court should appoint a guardian *ad litem* with relevant expertise, someone who, by training and experience, is able to subject the account to a meaningful critique.

¶ 101     Just because a guardian *ad litem* misses a potential issue in an annual or interim account, it does not necessarily follow, under section 24-11(b), that the issue is forfeited. The statute contains an exception for fraud, accident, or mistake: "in the absence of fraud, accident or mistake the account as approved is binding upon the ward." 755 ILCS 5/24-11(b) (West 2012). We have interpreted the phrase "fraud, accident or mistake" as a duplication of the grounds for relief under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2012)). *In re Estate of Moore*, 175 Ill. App. 3d 926, 930-31 (1988); see also *Smith v. Airoom, Inc.*, 114 Ill. 2d 209, 222 (1986) ("[A] party relying on section 2-1401 is not entitled to relief unless he shows that through no fault or negligence of his own, the error of fact or the existence of a valid defense was not made to appear to the trial court." (Internal quotation marks omitted.)); *Physicians Insurance Exchange v. Jennings*, 316 Ill. App. 3d 443, 458 (2000) ("We note that the due diligence requirement [of section 2-1401] may be relaxed if actual fraud or unconscionable conduct played a part in the trial court's judgment."); *American Ambassador Casualty Co. v. Jackson*, 295 Ill. App. 3d 485, 489 (1998); *Stoller v. Holdren*, 47 Ill. App. 2d 81, 82-83 (1964) ("To vacate a valid judgment after 30 days from its entry under Sec 72 of the Civil Practice Act [(Ill. Rev. Stat. 1963, ch. 110, § 72) (now section 2-1401)] defendants must show reasonable excuse for failure to defend within the appropriate time or that they were prevented from so doing by the fraud, act or concealment of the opposing party, accident, excusable mistake or one or more of the grounds traditionally relied upon for equitable relief from judgments."). Section 2-1401 requires only "reasonable diligence," not extraordinary diligence. *Juszczyk v. Flores*, 334 Ill. App. 3d 122, 128 (2002). We are aware of no fraud, accident, or mistake in this case.


¶ 102                    H. The Bare Allegation of Fraud

¶ 103     At the conclusion of their brief, plaintiffs assert that by doing such things as "putting an inexperienced trust administrator in charge of an account of several million dollars," "allowing approximately $1 million to sit in the same account," and "discussing [an] investment strategy only in regard how to block a Petition To Terminate the Guardianship filed by the ward," Busey committed "a fraud on the ward and the Court." Plaintiffs do not explain how such acts or omissions conform to the definition of fraud. Broken promises and unfulfilled obligations are not fraud. *Ault v. C.C. Services, Inc.*, 232 Ill. App. 3d 269, 271 (1992); see also *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 169 (2005).


¶ 104                    I. The Failure To Make Repairs

¶ 105    In paragraph 4(C)(1)(v) of their second amended petition, plaintiffs accuse Busey of "[l]eaving two significant parcels of real estate–one in Champaign, Illinois, and the other in the State of Florida–in various states of repair without even inspecting on site the Florida condominium which it had been placed on notice had incurred significant property damage."

¶ 106    Busey points out that at the hearing of October 27, 2005, it was agreed that Busey would not have to make any inspection of the Florida property. The trial court made the following docket entry: "By agreement the estate guardian is relieve[d] of the burden at this time of making any inspections of the ward's property in Florida. No written order required."

¶ 107    Five parties appeared in that hearing: Lawrence Kanfer in his individual capacity, Ruth Kanfer in her capacity as the guardian of the person, Ruby Kanfer, Busey, and Bequette. Only two of those parties held a position entitling them to address the handling of the ward's property: the guardian of the estate (Busey) and the guardian *ad litem* (Bequette). Busey sought to be released of any obligation to inspect the Florida condominium, and Bequette agreed that Busey should be released from that obligation. That agreement is unenforceable. A guardian *ad litem* is powerless to waive any right of the ward. *Ortman v. Kane*, 389 Ill. 613, 624 (1945); *Cartwright v. Wise*, 14 Ill. 417, 418 (1853); *Mabry*, 281 Ill. App. 3d at 86; *Leonard v. Chicago Title & Trust Co.*, 287 Ill. App. 397, 400-01 (1936); 39 Am. Jur. 2d *Guardian & Ward* § 117 (2008). That includes the ward's right to have her real estate inspected to ensure it is in adequate repair, something a prudent owner of real estate normally would do. See *Parsons*, 110 Ill. App. 3d at 377 ("[T]he defendant as guardian had the duty to manage the ward's property with the same degree of vigilance, diligence and prudence as a reasonable man would use in managing his own property.").

¶ 108    The agreement of October 27, 2005, said nothing about the Champaign property. Even though Busey hired Hoggatt to do work on the Champaign property, it does not necessarily follow that Busey succeeded in putting that property in an adequate state of repair. See *G.M. Fedorchak & Associates, Inc. v. Chicago Title Land Trust Co.*, 355 Ill. App. 3d 428, 432 (2005) ("Dismissal pursuant to section 2-619 is warranted only where it is clear that no set of facts can be proved that would entitle the plaintiff to recover.").

¶ 109    By approving the accounts, the trial court cannot reasonably be understood as approving Busey's upkeep of the real estate.

¶ 110    Therefore, we reverse the dismissal order insomuch as it holds plaintiffs to be barred from recovering losses resulting from the failure to keep the Florida property and the Champaign property in an adequate state of repair. See *Parsons*, 110 Ill. App. 3d at 377. Otherwise, we affirm the trial court's judgment.

¶ 111                              III. CONCLUSION

¶ 112    For the foregoing reasons, we affirm the trial court's judgment in part and reverse it in part and remand this case for further proceedings.

¶ 113    Affirmed in part and reversed in part; cause remanded.