666 N.E.2d 16 (1996)
281 Ill. App.3d 76
216 Ill.Dec. 848
In re GUARDIANSHIP OF Myrtle E. MABRY, a Disabled Adult (Myrtle E. Mabry, a Disabled Adult, Petitioner-Appellant
v.
Gerald F. Roberts, et al., Guardians of the Estate, et al., Guardians-Appellees (D.W. Schleder, Claimant-Appellee)).
No. 4-95-0303.
Appellate Court of Illinois, Fourth District.
Argued October 11, 1995.
Decided May 9, 1996.
Rehearing Denied June 27, 1996.
*17 George D. Boyle, Prairie State Legal Services, Inc., Bloomington, Bernard Shapiro, Prairie State Legal Services, Inc., Rockford, for Myrtle E. Mabry.
James R. DePew, DePew, Grimes & DePew, Bloomington, for Gerald Roberts.
Kenneth L. Strong, Strong, Blakeman & Schrock, Ltd., Pontiac, for Dr. D.W. Schleder.
Presiding Justice COOK delivered the opinion of the court:
An incompetent adult appeals the trial court's approval of a settlement in which the guardian of her estate transferred title to her home (and paid $3,020 to have it emptied, $2,500 of which it borrowed against the estate) in satisfaction of a $18,000 veterinary bill for boarding her cats, without receiving any actual evidence regarding the value of the home or inquiring into the validity or reasonableness of the bill. We reverse and remand.
On May 24, 1994, Myrtle Mabry was admitted to Pekin Memorial Hospital and treated for congestive heart failure, pulmonary edema and high blood pressure. In a May 26 letter to Curtis Myers, Mabry's attorney, Dr. John Lovell, her physician, stated Mabry showed "signs of dementia, probably an Alzheimer's type." Observation notes by hospital staff supported the conclusion there was some dementia.
On May 27, Gerald F. and Francis Ann Roberts (Gerald and Fran, respectively, collectively referred to as the Robertses) filed a petition for guardianship of Mabry. The circuit court found Mabry disabled based on the report of Dr. Lovell and the observation notes and appointed the Robertses temporary guardians of the estate and the person. The Robertses were named in part because of a power of attorney Mabry executed in September 1991, which named the Robertses as her attorney with respect to business affairs and indicated a preference that they be named as guardian of the estate and/or of the person if such ever became necessary. Robert Follmer was appointed Mabry's guardian ad litem (GAL).
The first hearing on the petition came on June 24, before Judge Frobish. In addition to the above information, the court also received the report of Dr. Larry Stalter, from the Livingston Manor Nursing Home. Dr. Stalter confirmed the findings of dementia, and stated "it is my general feeling that she would not be able to manage her affairs at home." He suggested a formal psychiatric evaluation to "help us further guide placement and therapy in the future."
*18 At the hearing Mabry said she did not believe the power of attorney was still in effect because she had earlier revoked it. Myers, who drafted the power, said Mabry had at times directed that it be rescinded but at other times had directed that it remain as it was, and said "[s]he did not ever follow through with rescinding it." Mabry also said that she did not wish the Robertses to be her temporary guardians. The court left Fran as temporary guardian of the person, but made the Bank of Pontiac (bank) temporary guardian of the estate, conditioned on its filing an acceptance of office, which it did.
GAL Follmer said Mabry had no objection to Myers continuing his participation in the matter despite his earlier representation of both her and the Robertses. Follmer went further and stated that "I as GAL will even waive any conflict that he may have. I think it's best to have someone familiar with the situation involved anyway."
The next hearing occurred on August 30. The court considered an August 17 letter from Ann James, a licensed social worker, in which she called Mabry "a delightful person with no signs of psychiatric illness," but nevertheless recommended guardianship over Mabry's business matters and some degree of guardianship over her person concerning living arrangements, because of difficulties with her short-term memory. Follmer said Mabry was basically in agreement with that letter, and her "main concern is being able to go clean out her house." On September 19, the court appointed the bank as plenary guardian of the estate and Fran as limited guardian of the person. Specifically, Fran was to help Mabry find an apartment until she could return home. Mabry was allowed to clean her home out, but was not allowed to live there until it had been certified habitable by the County Public Health Department or some other responsible agency.
Meanwhile, on July 14, Dr. D.W. Schleder, a veterinarian, filed a claim against Mabry's estate for $18,040.70 for "boarding, veterinary services and hospital care for 12 animals for one year and ten months." The number of animals (all cats) ranged from 12 to 2, and the balance of $18,040.70 was run up between April 29, 1993 (when there was a credit balance of $310.20 on the account), and May 31, 1994, when Schleder destroyed all remaining animals. The final balance took into account the credit of $310.20 and $3,706.64 which was paid on the account between April 1993 and June 1994, meaning a total of $22,057.54 in charges were incurred in the 13 months.
Judge Frobish recused himself due to business contacts with Schleder, and this claim was transferred to Judge Frank.
The bank, as plenary estate guardian, waived all issues (e.g., reasonableness of charge, necessity of services and validity of bill) except Mabry's competence to initially enter into contracts in its answer to Schleder's motion for summary judgment. The court granted summary judgment except as to Mabry's competence because of the bank's waiver. Trial on the competence issue was set for Monday, January 23, with experts to be disclosed by January 1.
On, Friday, January 20, the bank for the first time notified the court and counsel of an expert whose testimony it wished to introduce, and moved for a continuance to depose that expert. The court denied the continuance, suggesting the testimony would likely be barred because of the violation of the disclosure deadline. The bank and Schleder then reached a settlement on January 23, just before trial. They agreed that in satisfaction of the claim the bank would transfer title to Mabry's home to Schleder, pay the 1994 property taxes, and empty it within 30 days. Over the objections of Mabry and the Robertses, the court approved the settlement as being in Mabry's best interests.
No evidence was introduced regarding the value of the house, but counsel for Schleder said two appraisals placed the value between $18,000 and $20,000. (Judge Frobish had previously noted the home was listed on the tax rolls as having a value of $27,000.) Neither the appraisals nor affidavits or testimony by the appraisers was introduced into evidence. The court noted that while Mabry was not living at the house, it was a financial drain on the estate.
According to inventories filed in July 1994 by the Robertses and in February 1995 by *19 the bank, Mabry owned real and personal property other than the home with a value of approximately $100,000, including a condominium with an undisputed worth of $80,000. She also had a gross income of $2,524.95 per month, or $30,299.40 per year.
On February 22, the bank filed a "Petition of Estate Guardian to Borrow Money and Sell Personal Property." The bank requested permission to (1) sell Mabry's personal effects at public auction, and (2) borrow $10,000 to pay expenses, including charges incurred emptying the house. With respect to the latter request, the bank "estimated that it will be possible to repay the loan from income to the Estate within approximately six months." At a hearing on, inter alia, this petition, it was revealed that the Robertses had volunteered to clean out the house without charge to the estate, but the court nevertheless allowed the bank to borrow $2,500 to pay for emptying the house due to the 30-day deadline in the settlement agreement.
The Robertses took Mabry to Prairie State Legal Services, where she retained attorney George Boyle and filed a motion to reconsider. She argued (1) the durable power of attorney naming the Robertses meant the bank had no power to transfer property, (2) there were other assets which could have been used and she had the intent to return to the residence, (3) she argued it was error to approve the transfer when the validity of the bill had not been scrutinized, and (4) Myers had conflicts of interests which also constituted grounds for reconsideration.
At a March 6 hearing, Follmer admitted he had been (and remained) unsure as to his proper role as a GAL. He believed he was merely to prevent gross abuses of discretion by the guardians of the estate and person. He said he did not believe at the time of the January 23 hearing that the settlement was in Mabry's best interest, but did not object because he did not believe the decision was so far out of bounds as to be arbitrary.
The motion to reconsider was denied. The court rejected the first ground, concluding the instrument did not grant the Robertses the power to sell, nor was it sure the power was durable. As to the second ground, the court noted it got the impression that as a practical matter Mabry's eventual return to the home probably was not a possibility and stated "[i]t was [the bank's] opinion as guardian that the size of this bill would preclude it[s] being paid from her monthly income"; therefore, the condominium would have to be sold, and it was better to transfer the income-depleting house than the income-generating condo, even taking into account the "emotional need to keep it." On the third ground, the court said it still believed the decision to transfer was sound, "especially given the summary judgment not questioning the amount of the debt or the appropriateness of the debt; just simply questioning whether at some point she retained competence to enter into contracts." As to Myers' alleged conflict of interest, the court stated that the presence of a GAL meant there was no danger of Mabry's interests not being represented.
The factual predicate for the allegations of conflicts of interest is as follows. Myers drafted the durable power of attorney for Mabry. He represented the Robertses in the original proceeding for guardianship over Mabry. He represented the bank in all subsequent proceedings, including the settlement conference, in which the bank's position (that the settlement was in Mabry's best interest) was directly opposed by Fran, Gerald and Mabry. At the hearing on the motion to reconsider, Myers argued for the bank that the durable power of attorney he had drafted for Mabry terminated when she was declared incompetent, a position again diametrically opposed to that of Mabry and the Robertses. He also said (referring to the June 24 hearing at which the bank was appointed temporary guardian of the estate), "[f]rom that point on, I've represented the bank as temporary guardian and I represented Jerry [sic] and Fran Roberts individually but as temporary guardians of the person who they had been up to that time." Myers did not withdraw from representation of the Robertses until they requested he do so, on March 15, 1995. There is no indication he ever affirmatively withdrew from representation of Mabry.

*20 I. STANDING
Schleder raises as a threshold issue Mabry's ability to appeal on her own behalf, noting that section 11a-18 of the Probate Act of 1975 (Probate Act) (755 ILCS 5/11a-18(c) (West 1994)) makes it the responsibility of the guardian of the estate to represent the ward in all litigation. We find Schleder has waived this issue by failing to raise any objection at the hearing on the motion to reconsider. The court noted on the record that Boyle was entering an appearance as Mabry's personal lawyer, separate from the GAL, and approved such, without any objection from Schleder. This gave Boyle authority to act for Mabry. See In re Estate of Kutchins, 169 Ill.App.3d 641, 646, 120 Ill.Dec. 114, 117, 523 N.E.2d 1025, 1028 (1988).
Lack of standing is an affirmative defense and is waived if not raised at the trial court level. Greer v. Illinois Housing Development Authority, 122 Ill.2d 462, 508, 120 Ill.Dec. 531, 552, 524 N.E.2d 561, 582 (1988). This bar to Schleder's challenge on appeal is not obviated by the rule that an appellee may raise an issue for the first time on appeal if the necessary factual basis for the determination is contained in the record. Because of Schleder's failure to object at the proceedings below, the record is devoid of indication whether the trial court treated the motion as one brought by Mabry on her own behalf or as one brought by the attorney as "next friend" of Mabry, as it may do. 755 ILCS 5/11a-18(c) (West 1994). We thus proceed to the merits of the appeal.

II. POWER OF ATTORNEY
Mabry executed a power of attorney in 1991, naming the Robertses as her agents. She claims (1) the power of attorney is durable and survives any finding of incompetency; (2) it reserves to the Robertses the right to sell and transfer real estate; (3) it was never overridden by court order; and therefore (4) the bank as estate guardian had no power to transfer any of her real estate, much less her home. Schleder, on the other hand, argues that (1) since the power of attorney included a directive that the Robertses be named as guardians of her person and/or estate if it were ever necessary, there was intent that the power of attorney terminate at such time; (2) Mabry's statements at the first hearing constituted an effective revocation of the power; (3) the lack of express authority to sell real estate meant that power was not granted by the instrument and, therefore, the bank was authorized to transfer it with court approval; and (4) Schleder dealt with the guardian in good faith.
A power of attorney lasts until the principal's death unless it states an earlier termination date. 755 ILCS 45/2-5 (West 1994). A guardian of the person or of the estate has no power over property subject to the agency absent a court order expressly directing it to exercise powers of the principal under the agency. 755 ILCS 45/2-10 (West 1994). Thus, if the instrument granted the Robertses the power to sell or transfer real estate and survived the declaration of incompetence, the bank would not have had the power to transfer the home and the settlement would have to be set aside.
Mabry's argument fails because, as the circuit court correctly observed, the instrument did not grant the power to sell real estate. The instrument grants authority "(1) To manage and lease my real estate, collect the rent therefrom and pay the usual and customary expenses paid by owners of real estate," and "(7) And, in general, to do all other acts, matters and things whatsoever in or about the specified premises of this Power of Attorney to all intents and purposes as I could do in my own proper person if personally present."
Paragraph one, the only one which mentions powers over real estate, nowhere mentions the power to sell or transfer. Since Mabry specifically listed certain powers with respect to real estate, those powers not mentioned should not be added to the list. Paragraph seven, however, gives the power to do "all other acts, matters and things" which the principal could if personally present. Mabry argues this language should be interpreted to grant any powers over real estate which may not have been granted by the first paragraph. We disagree. In the statutory short form power of attorney, a grant of authority with respect to "[a]ll other property powers *21 and transactions" will not operate to reinvigorate a category which the principal had expressly limited within the same document. 755 ILCS 45/3-4(o) (West 1994). Thus, a catchall provision will not expand a specifically limited power absent clear evidence of the principal's intent that it do so. There is no such evidence before us. Since the power to sell was not granted by the instrument, it passed to the bank as plenary guardian of the estate.

III. BEST INTERESTS
Mabry also asserts the trial court erred in determining the settlement was in her best interests. She argues (1) the trial court based its decision in part on an erroneous belief that she would never return to her home, (2) she has an emotional attachment to her home, and there were other assets available to pay the claim, (3) there was insufficient or at least conflicting evidence of the home's value, (4) the court erred in approving the settlement without judicial inquiry into its validity or reasonableness, and (5) a conflict of interest on the part of Myers and the ineffective assistance by the GAL require reversal.
It is acceptable, in proper circumstances, for a guardian to settle a ward's lawsuit. See 755 ILCS 5/19-8, 11a-18(a) (West 1994). However, the court must approve a settlement as in the best interests of the ward before it will be given effect. See 755 ILCS 5/11a-18(a) (West 1994); Ott v. Little Co. of Mary Hospital, 273 Ill.App.3d 563, 573, 210 Ill.Dec. 75, 82, 652 N.E.2d 1051, 1058 (1995) (court must approve settlement of minor's litigation as in best interests); Zimmerman v. Village of Skokie, 174 Ill. App.3d 1001, 1008, 124 Ill.Dec. 618, 622, 529 N.E.2d 599, 603 (1988) (the courts must protect the interests of disabled persons just as they protect the interests of minors); In re Estate of Berger, 166 Ill.App.3d 1045, 1055, 117 Ill.Dec. 339, 346, 520 N.E.2d 690, 697 (1987) ("The court must do nothing `wantonly or unnecessarily to alter the ward's property, but on the contrary takes care, for his sake, that if he recovers he shall find his estate as nearly as possible in the same condition as he left it.' (Lewis v. Hill (1944), 387 Ill. 542, 546, 56 N.E.2d 619[, 621].)"). The court's role is different than when an ordinary consent decree is presented to it. Approving a ward's settlement is more than a mere matter of recording the parties' agreement: the court must make a judicial determination that the settlement is in the best interest of the ward. This requirement is "intended to substitute a judicial determination for the guardian's personal discretion in order to provide additional protection to the ward." Burton v. Estrada, 149 Ill.App.3d 965, 976, 103 Ill.Dec. 233, 241, 501 N.E.2d 254, 262 (1986). This role is not passive, and it is not sufficient for the court to accept the recommendation of the GAL, estate or personal guardian, or anyone else without further inquiry. The trial court is to "protect[] the incompetent as its ward, vigilantly guarding his property and viewing him as a favored person in the eyes of the law." Berger, 166 Ill.App.3d at 1055, 117 Ill.Dec. at 346, 520 N.E.2d at 697.
It does not appear that the instant settlement was appropriate on the record currently before this court. The philosophy underlying article XIa of the Probate Act (Guardians for Disabled Adults) (Disabled Adults Act) (755 ILCS 5/11a-1 through 5/11a-22 (West 1994) (amended by Pub. Act 89-396, § 15, eff. August 20, 1995) (1995 Ill.Legis.Serv. 3813, 3814 (West))) is that when disabled persons need care they "should be subject to the least restrictive alternative means of delivering the services." D. Jost, The Illinois Guardianship for Disabled Adults Legislation of 1978 and 1979: Protecting the Disabled from their Zealous Protectors, 56 Chi.-Kent L.Rev. 1087, 1098 (1980) (hereinafter Jost). The Probate Act treats transfer of a ward's personal estate differently from transfer of real estate (compare 755 ILCS 5/19-2 (West 1994) (court may approve transactions in personal property when in ward's "best interests") with 755 ILCS 5/20-3 (West 1994) (court may approve transactions in real property only when "necessary or expedient" for support and education, payment of debt or reinvestment)), and in general transfers of a ward's real property should be disfavored. While we do not go so far as to hold that a ward's personal *22 estate must be exhausted before a court may approve transfer of any real estate, the transfer of a ward's home should not be the first alternative considered.
The statute does not specify all of the factors which must enter into a court's decision regarding the ward's best interests, and financial impact is an appropriate factor to consider. However, other variables must also be considered. As the trial court observed, "I might get ten bucks for my family album, but my family album is worth more than ten bucks to me." In the child custody context, this court has held that if the ward is sufficiently mature her wishes will be an "important element to be taken into account," although they will not bind the court. In re Marriage of Apperson, 215 Ill.App.3d 378, 384, 158 Ill.Dec. 864, 868, 574 N.E.2d 1257, 1261 (1991). We find the same rule applies when the ward is a disabled adult.
Sufficient attention must also be paid to the input of the personal guardian. The circuit court did allow the personal guardian to argue against the settlement, but not until after the court had decided to approve it. The legislature has seen fit to create two separate types of guardians for disabled adults with different responsibilities. While the estate guardian is charged with conducting the ward's litigation, its responsibilities generally go to the preservation of the ward's estate and not to his or her comfort, self-reliance, or independence. See 755 ILCS 5/11a-17, 11a-18 (West 1994). The legislature has decided the latter interests merit a separate guardian for their protection, and we believe the courts must give them careful consideration as well in evaluating a proposed settlement.
Assuming it was appropriate to settle the suit at all, transfer of the home was not the only alternative for payment of the debt. Less than one month after the hearing on the settlement, the bank filed its petition to borrow money and sell personal property in which it averred it could repay a $10,000 loan from income to the estate within six months. The inventory of assets filed by the bank included $7,475 worth of stock which could easily have been converted into cash. A condominium with an undisputed worth of $80,000 might have been mortgaged. Finally, while it was entirely proper to consider the fact that the home was a financial drain on the estate, Mabry must live somewhere. If she is allowed to live on her own, as the letter of James suggests she eventually should be, she will either have to buy a new house or continue to rent an apartment, either of which would also require an outlay by the estate.
We also have grave doubts that any settlement was appropriate. It appears the trial court believed there was an issue of fact as to whether the veterinary services were reasonable and customary, but granted summary judgment on that issue because the estate guardian "admitted" or waived it. This is inappropriate. A conservator or guardian cannot waive any rights of the ward. Jeanblanc v. Mellott, 152 Ill.App.3d 801, 811, 105 Ill.Dec. 705, 712, 504 N.E.2d 990, 997 (1987); Mastroianni v. Curtis, 78 Ill.App.3d 97, 101, 33 Ill.Dec. 723, 726, 397 N.E.2d 56, 59 (1979). Any argument that by granting summary judgment here the court implicitly held that summary judgment was in the ward's best interest is without merit. See Mastroianni, 78 Ill.App.3d at 100-01, 33 Ill.Dec. at 726, 397 N.E.2d at 59. Further, with respect to the reasonableness issue, the trial court's initial instinct appears to have been entirely correct. Veterinarians are allowed to dispose of animals "abandoned" at their establishment so long as they give the owner proper notice. 225 ILCS 115/18 (West 1994). If it was reasonable to destroy the animals after the charges reached $22,000, why was it not reasonable to destroy the animals after the charges reached $1,000?
We also have doubts about the numerous roles played by attorney Myers. We do not believe it was possible for him to provide effective representation to both the personal and estate guardians when their positions diverged. Nor was it proper for him to argue that the power of attorney which he had drafted was not intended to survive a declaration of incompetency, especially when the ward and the personal guardian took the opposite position. Finally, we question Myers' representation at the settlement hearing that medical reports indicated there *23 was "no possibility" Mabry would ever return to her home. Whether or not this statement was accurate, it was improper for Myers to make it when not only the GAL but also the guardian of the personstill his clientmaintained otherwise.
We need not decide whether these lapses would constitute grounds for reversal standing alone. Nor do we mean to suggest Myers necessarily acted in bad faith. Proceedings involving guardian and ward can be confusing for counsel as well as the parties. The GAL admitted some confusion about his proper role.
The purpose of guardianship of a disabled adult is "to promote the well-being of the disabled person, to protect him from neglect, exploitation, or abuse, and to encourage development of his maximum self-reliance and independence." 755 ILCS 5/11a-3(b) (West 1994). It is to be ordered "only to the extent necessitated by the individual's actual mental, physical and adaptive limitations." 755 ILCS 5/11a-3(b) (West 1994). In keeping with this principle, the court's discretion is limited even after it has found a person to be disabled. A plenary guardian may only be appointed if the ward is "totally without capacity" and limited guardianship will not provide sufficient protection to the ward, his or her estate, or both. Pub.Act 89-396, § 15, eff. August 20, 1995 (amending 755 ILCS 5/11a-12(b) (West 1994) (1995 Ill.Legis.Serv. 3813, 3817 (West))). Even a limited guardian may be appointed only if the court finds guardianship to be "necessary" for the protection of the person, estate or both of the disabled person. Pub.Act 89-396, § 15, eff. August 20, 1995 (amending 755 ILCS 5/11a-12(c) (West 1994) (1995 Ill.Legis.Serv. 3813, 3817 (West))).
It is appropriate to appoint a guardian of the person when the incompetent "lacks sufficient understanding or capacity to make or communicate responsible decisions concerning the care of his person." 755 ILCS 5/11a-3(a)(1) (West 1994). The personal guardian's duties are to "procure" and "make provision for" the "support, care, comfort, health, education and maintenance, and professional services as are appropriate" for the ward and his or her minor and adult dependent children, to the extent ordered by the court. 755 ILCS 5/11a-17(a) (West 1994). The personal guardian is also to "assist the ward in the development of maximum self-reliance and independence." 755 ILCS 5/11a-17(a) (West 1994).
A guardian of the estate, on the other hand, may be appointed when the disability renders the incompetent "unable to manage his estate or financial affairs." 755 ILCS 5/11a-3(a)(2) (West 1994). The estate guardian's responsibilities differ from those of the personal guardian. First, he or she is to manage the ward's estate "frugally" and apply the income and principal
"so far as necessary for the comfort and suitable support and education of the ward, * * * or for any other purpose which the court deems to be for the best interests of the ward, and the court may approve the making on behalf of the ward of such agreements as the court determines to be for the ward's best interests." 755 ILCS 5/11a-18(a) (West 1994).
The estate guardian may perform the ward's contracts, including execution and delivery of legal instruments, with the approval of the court which issued its letters. 755 ILCS 5/11a-18(b) (West 1994). It is also charged with appearing on the ward's behalf in all legal proceedings. 755 ILCS 5/11a-18(c) (West 1994). However, the court may also appoint or allow any person to "commence, prosecute or defend any proceeding" as the next friend of the ward or appoint a next friend or GAL to "defend the interests of the ward in that court." 755 ILCS 5/11a-18(c) (West 1994).
The role of the GAL is set out in section 11a-10 of the Probate Act, which was also revised by Public Act 89-396. See Pub.Act 89-396, § 15, eff. August 20, 1995 (1995 Ill.Legis.Serv. 3813, 3814 (West)). It now reads in relevant part that upon the filing of a petition pursuant to section 11a-8, "[t]he court shall appoint a [GAL] to report to the court concerning the respondent's best interests consistent with the provisions of this Section" (emphasis omitted) (Pub.Act 89-396, § 15, eff. August 20, 1995 (1995 Ill.Legis.Serv. 3813, 3815 (West))), where it previously instructed the court to "appoint a *24 [GAL] to represent the respondent" (emphasis added) (755 ILCS 5/11a-10(a) (West 1994)). The statute represents a clarification rather than a change in the law. A GAL functions as the "eyes and ears of the court" (In re Marriage of Wycoff, 266 Ill.App.3d 408, 415, 203 Ill.Dec. 338, 345, 639 N.E.2d 897, 904 (1994)), not as the ward's attorney.
The GAL represents the ward's best interests (as the GAL sees them), not the ward. See Jost, 56 Chi.-Kent L.Rev. at 1094 ("The [GAL] is responsible for representing the respondent. Traditionally, this has meant representing the respondent's best interests as opposed to serving as an advocate for the respondent's possibly ill-advised wishes"). If the GAL and ward are in agreement, the GAL does in effect represent the ward. However, the court must appoint separate counsel if the ward requests it or if the ward and GAL take different positions. 755 ILCS 5/11a-10(b)(2) (West 1994). Finally, we note that section 11a-10 is entitled "Procedures preliminary to hearing." 755 ILCS 5/11a-10 (West 1994). Once a guardian of the estate has been named, it becomes that entity's responsibility to represent the ward in all litigation. 755 ILCS 5/11a-18(c) (West 1994). Thus a GAL is only required prior to the hearing on respondent's competence, although a court may still appoint a GAL or next friend to represent the ward's interests in subsequent litigation. 755 ILCS 5/11a-18(c) (West 1994).
The GAL does not represent the ward in a normal attorney-client relationship; in fact the GAL need not even be an attorney. See 755 ILCS 5/11a-10(a) (West 1994) (as modified by Pub. Act 89-396, § 15, eff. August 20, 1995 (providing qualifications for a GAL who is not a licensed attorney) (1995 Ill.Legis.Serv. 3813, 3815 (West))). No attorney-client privilege exists between the GAL and ward. Ill.Ann.Stat., ch. 40, par. 506, Historical & Practice Notes, at 629 (Smith-Hurd 1980). The GAL's duty is to serve the ward's best interests, not to serve the ward.
In sum, we hold the court erred in approving the settlement without satisfying itself that it would be in Mabry's best interests. Its grant of partial summary judgment to Schleder was error for the same reason. For the reasons above stated, we reverse and remand to the circuit court of Livingston County for further proceedings not inconsistent with this opinion. Before entering any judgment in favor of Schleder, the court must determine the validity and reasonableness of the bill. Before transferring the home in payment of debt, the court must require an accounting and determine that such transfer is "necessary or expedient," and in the best interests of the disabled adult. No transfer shall be approved until the court determines the value of the home.
Reversed and remanded.
STEIGMANN and McCULLOUGH, JJ., concur.