# Illinois Official Reports

## Appellate Court

***Estate of Howell v. Howell*, 2015 IL App (1st) 133247**

| | |
|---|---|
| Appellate Court Caption | ESTATE OF DONALD HOWELL, a Disabled Person, by LaTanya Turks and The Northern Trust Company, as Coguardians of the Estate, Petitioners-Appellants, v. DONALD BRENARD HOWELL, Respondent-Appellee. |
| District & No. | First District, Fifth Division<br>Docket No. 1-13-3247 |
| Filed | June 19, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-P-04974; the Hon. Daniel B. Malone, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |
| Counsel on Appeal | Ray J. Koenig III, Eric Dorkin, and MacKenzie A. Hyde, all of Clark Hill PC, and Leonard J. LeRose, Jr., of Law Offices of Leonard J. LeRose, Jr., both of Chicago, for appellants.<br><br>Richard L. Swedberg and Donald M. Hodgkinson, both of Swedberg & Hodgkinson, of Chicago, for appellee.<br><br>David A. Martin, of Chicago, guardian *ad litem*. |

Panel    JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Presiding Justice Palmer and Justice Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1    Two appeals have been consolidated. In the first one, No. 1-13-3247, The Northern Trust Company and LaTanya Turks, as coguardians of the estate of Turks' adult son, Donald Howell, appeal from an order granting their petition to engage in estate planning but rejecting a proposed plan that would benefit his mother without distributing funds to his father and 10 half siblings who were born to other mothers. We are respectfully referring to Donald by his first name to avoid confusing it with his father's similar name. The statute that authorizes estate planning for an adult disabled ward of the court mandates that the estate guardians' actions shall be "in keeping with the ward's wishes so far as they can be ascertained" and that the "ward's wishes as best they can be ascertained shall be carried out." 755 ILCS 5/11a-18 (West 2000). Turks, who has been her son's fulltime caregiver since he was born with severe cognitive deficits in 1991, contends her son's father and the father's 10 other children with other mothers have taken little to no interest in her son and have not been a part of his life. The trial court ruled–as a matter of law–that because Donald was born with profound cognitive deficits and has never expressed testamentary capacity, his wishes could not be ascertained and any estate plan must follow the rules of intestacy. On appeal, the coguardians contend it was error to decide the issue as a matter of law and to refuse to conduct an evidentiary hearing to determine whether it was in Donald's best interests to name his mother as the sole beneficiary. The second appeal, No. 1-14-0180, concerns attorney fees and asks us to determine whether the estate should compensate the coguardians' attorneys for pursuing this appeal.

¶ 2    Donald's profound cognitive impairment dates to his birth on November 15, 1991, with microcephaly, because his mother was exposed to lead during her pregnancy. Turks did not suffer any apparent health effects herself, but on Donald's behalf, she sued her Chicago landlord. A jury awarded Donald $16.5 million. His estate currently exceeds $11 million.

¶ 3    According to a report prepared by a guardian *ad litem* (hereinafter GAL) when Donald was 17 years old in 2009, Donald required constant supervision and was in need of full guardianship rather than a less restrictive form of guardianship. When the GAL interviewed Donald and posed questions about his care, Donald ignored him and continued to watch television, but when asked about his favorite foods, Donald walked to the refrigerator and returned with three items. Also, Donald "constantly repeat[ed] nonsensical words" during the GAL's visit to the home. Turks said that her teenage son was functioning like a young child in that he would try to dress himself, but usually put his clothes on the wrong way, instead of brushing his teeth he would play with the toothbrush, and because he did not recognize dangers, their entire apartment had to be "child proof." Donald took prescription medications daily for various conditions. He was attending special classes at a public school and he did homework in the afternoons before getting play time.

¶ 4    Based in part on the GAL's recommendation, in February 2010, the trial court adjudicated Donald to be a disabled person. The court noted in its written order that although "acceptable notice was transmitted" to Donald's father, he did not respond. The court appointed Turks as the guardian of her son's person and appointed Turks and The Northern Trust Company as the coguardians of his estate.

¶ 5    The record also indicates that in 2011, Donald was having difficulty with verbal communication and needed assistance with daily activities including grooming, dressing, eating, and taking medication. Donald attended high school part time where he received physical, occupational and speech therapies and he enjoyed activities at his church, watching sports on television, listening to music, dancing, and arts and crafts.

¶ 6    Turks has been a fulltime caregiver for her only child and is not employed elsewhere. For the past 12 years, an additional caregiver, Tyheshia Wilkins, has resided with Donald and his mother. There are conflicting statements in the record as to whether Wilkins is related to the family. Turks' describes her son's father, Donald Brenard Howell, as follows. Howell has never lived with Turks or Donald. Howell has multiple criminal convictions and was first incarcerated in 1989. For the first 6½ years of Donald's life, Howell was in a federal penitentiary. After being released, Howell visited Donald twice in about 18 months, with each visit lasting approximately 15 minutes. He was then reincarcerated and spent 6½ years in prison. Since his release over six years ago from the second incarceration, Howell has visited Donald at most six times, Howell has never assisted with Donald's daily care, Howell has never "involved himself in any significant respects in Donald's life," and Howell has contributed only $400 to Donald's support and comfort.

¶ 7    In late 2012, Turks and The Northern Trust Company petitioned the court for direction and authority to proceed with estate planning. Donald's primary care physician gave his opinion that Donald lacked sufficient capacity to transact ordinary business and lacked testamentary capacity. Donald's GAL reported that Donald was not capable of directing the preparation of his estate planning documents and it was the GAL's recommendation that the coguardians prepare and present a revocable trust and pour over will for court approval.

¶ 8    In late 2012, the coguardians petitioned the court to execute the estate planning documents currently at issue. The plan includes the creation of a revocable trust so as to avoid probate proceedings and reduce attorney fees incurred after Donald's death. Under the proposed trust, Donald would be the sole beneficiary during his lifetime with all disbursements subject to court approval. Thus, the procedures currently in place would continue during Donald's lifetime. After his death, his mother would become the beneficiary of the trust corpus. If she did not survive Donald, the alternate beneficiaries would be Wilkins, and then his aunt Laurie, who is Turks' younger sister. Although Donald did not own any property at the time and it is unlikely that any assets will be titled in his name, the proposed plan included a pour over will distributing all assets to the revocable trust.

¶ 9    Turks specified in the petition that she believed Donald's father had several other biological children whom Donald had met "on a few occasions," but that none of these half siblings maintained a relationship with Donald. Turks contended that because Howell and his other children were not involved in Donald's life, the distributive portions of the proposed estate plan were "consistent with Donald's wishes so far as they can be ascertained." Under the rules of intestacy in Illinois, if Donald were to die survived by his parents and half siblings, the parents and siblings would inherit Donald's intestate property in equal shares, except that if

only one parent was living, that parent would get a double share. 755 ILCS 5/2-1(d) (West 2000). The court ordered Donald's father to compile the names of all his children and their mothers and the contact details for the children. The list Howell submitted indicates that he has had 11 children with 11 different woman, that all but 1 of the children were born between 1985 and 1991, that Donald is his tenth child, and that the last child was born in 2013 (during these proceedings). In January 2013, the coguardians used the compiled list to notify Howell and Donald's 10 half siblings of the pending petition. Howell is the only individual who responded.

¶ 10    Response briefs followed. In his response, the GAL proposed that because it was impossible to determine Donald's wishes, any distributive portion of the estate should follow the intestacy statute.

¶ 11    In September 2013, the trial court ordered the coguardians, over their objection, to prepare an estate plan in which the distribution of assets after Donald's death would be consistent with the laws of intestacy. Therefore, if Donald were to pass away today, under the estate plan ordered by the trial court, Donald's assets would be split into 12 shares so that Turks, Howell, and Howell's 10 other children with different mothers would all receive equal shares. 755 ILCS 5/2-1(d) (West 2000). The court allowed the coguardians to specify in the trust, pour over will, and assignment that were created that the court had preserved Turks' rights under section 2-2 of the Probate Act of 1975 (755 ILCS 5/2-2 (West 2000)), which provides for the probate court to reduce or eliminate distribution to a parent who has willfully neglected, deserted, or failed to provide support to a child. The court's order indicates its final determination was appealable within the meaning of Supreme Court Rule 304(a) (Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010)) and the coguardians have timely appealed from that order. The trial court next considered a fee petition filed by counsel for coguardian The Northern Trust Company. The court awarded fees from the estate for the legal work leading up to the court's ruling in September 2013, but rejected fees related to the appeal of that order. The coguardians filed a separate appeal regarding the fee petition and that appeal was assigned No. 1-14-0180 and then consolidated with the first appeal. Howell and the GAL oppose the appeals.

¶ 12    The coguardians argue that specific sections of the Probate Act allow an estate guardian to request court authority to create trusts with dispositive provisions deviating from the rules of intestacy. 755 ILCS 5/11a-18 (West 2000). The coguardians cite section 11a-18(a) of the Probate Act, titled "Duties of the estate guardian," which sets the ward's "best interests" as the touchstone for all actions taken by an estate guardian. 755 ILCS 5/11a-18(a) (West 2000). They also base their appeal on section 11a-18(a-5) of the Probate Act, which they contend expressly allows an estate plan that departs from intestacy, because the statute states that a guardian's actions may include "creating for the benefit of the ward or *others*, revocable or irrevocable *trusts* of his or her property that may *extend beyond* his or her disability or *life*" and also states "[t]he guardian shall not, however, be required to include as a beneficiary or fiduciary any person who he has reason to believe would be excluded by the ward." (Emphases added.) 755 ILCS 5/11a-18(a-5) (West 2000). The coguardians contend that determining what is in Donald's best interests is not something that could have been decided as a matter of law and that the trial court should have granted an evidentiary hearing

¶ 13    The GAL also relies on section 11a-18(a-5) of the Probate Act, but contends that statute dictates the consideration of only three factors when executing an estate plan for Donald. The court may authorize the guardian to act (1) "in keeping with the ward's wishes so far as they can be ascertained" and (2) and (3) "must consider the permanence of the ward's disabling

- 4 -

condition and the natural objects of the ward's bounty." 755 ILCS 5/11a-18(a-5) (West 2000). Applying these factors, the GAL emphasizes that Donald has never had testamentary capacity, cannot currently express his wishes about an estate plan, and that his disability is permanent and will always prevent him from expressing his wishes for the estate. The GAL contends that a best interests hearing is unnecessary because it would consist of the coguardians simply guessing at how Donald would wish to dispose of his estate. The GAL reasons that because the court "must consider *** the natural object's of the ward's bounty," then any estate plan for Donald must provide for not only his mother, but also his father and the 10 half siblings. The GAL concludes that the estate documents that were executed over the objection of the coguardians are consistent with the Probate Act and should be affirmed.

¶ 14    Donald's father also opposes the appeal, but presents a different line of reasoning in support of the trial court's ruling. We will set out and address that argument further below.

¶ 15    Statutory construction is a question of law, and a reviewing court interprets a statute pursuant to its own judgment, independent of, and not deferential to, that of the trial court. *Advincula v. United Blood Services*, 176 Ill. 2d 1, 12, 678 N.E.2d 1009, 1015 (1996). The goal of statutory construction is to ascertain and give effect to the intent of the legislature. *County of Du Page v. Illinois Labor Relations Board*, 231 Ill. 2d 593, 603-04, 900 N.E.2d 1095, 1101 (2008). Statutes should be interpreted as a whole, meaning different sections of the same statute should be considered in reference to one another so that they are given harmonious effect. *County of Du Page*, 231 Ill. 2d at 604, 900 N.E.2d at 1101. In fact, viewing all provisions of an enactment as a whole is one of the fundamental principles of statutory construction. *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 504, 732 N.E.2d 528, 535 (2000). If the language of the statute is plain, clear and unambiguous, it is our sole basis for discerning the intent of the legislature and we do not need to resort to other principles of statutory construction. *Gem Electronics of Monmouth, Inc. v. Department of Revenue*, 183 Ill. 2d 470, 475, 702 N.E.2d 529, 532 (1998); *County of Knox ex rel. Masterson v. Highlands, L.L.C.*, 188 Ill. 2d 546, 556, 723 N.E.2d 256, 263 (1999). We are never at liberty to depart from the plain language and meaning of a statute by reading into the language unstated exceptions, limitations, or conditions. *Gem Electronics*, 183 Ill. 2d at 475, 702 N.E.2d at 532; *County of Knox*, 188 Ill. 2d at 556, 723 N.E.2d at 263.

¶ 16    Applying these principles to the statutes at hand, we find that that the coguardians have applied the language as it was written by the legislature and that the trial court's order to the contrary must be reversed.

¶ 17    Section 11a-18(a-5) of the Probate Act provides:

        "The probate court, upon petition of a guardian, other than the guardian of a minor, and after notice to all other persons interested as the court directs, may authorize the guardian to exercise any or all powers over the estate and business affairs of the ward that the ward could exercise if present and not under disability. The court may authorize the taking of an action or the application of funds not required for the ward's current and future maintenance and support in any manner approved by the court as being in keeping with the ward's wishes so far as they can be ascertained. The court must consider the permanence of the ward's disabling condition and the natural objects of the ward's bounty. In ascertaining and carrying out the ward's wishes the court may consider, but shall not be limited to, minimization of State or federal income, estate, or inheritance taxes; and providing gifts to charities, relatives, and friends that would be

likely recipients of donations from the ward. The ward's wishes as best they can be ascertained shall be carried out, whether or not tax savings are involved." 755 ILCS 5/11a-18(a-5) (West 2000).

Continuing, section 11a-18(a-5) sets out a nonexhaustive list of possible "[a]ctions or applications of funds" that may be taken, including "(6) creating for the benefit of the ward or others, revocable or irrevocable trusts of his or her property that may extend beyond his or her disability or life." 755 ILCS 5/11a-18(a-5)(6) (West 2000).

¶ 18    In addition, the best interests standard governs a guardian's actions with regard to the estate of a disabled adult ward of the court. Section 11a-18(a), quoted in part above, is entitled "Duties of the estate guardian" (as distinguished from the personal guardian) and states the following:

"(a) To the extent specified in the order establishing the guardianship, the guardian of the estate shall have the care, management and investment of the estate, shall manage the estate frugally and shall apply the income and principal of the estate so far as necessary for the comfort and suitable support and education of the ward, his minor and adult dependent children, and persons related by blood or marriage who are dependent upon or entitled to support from him, *or for any other purpose which the court deems to be for the best interests of the ward*, and the court may approve the making on behalf of the ward of such agreements as *the court determines to be for the ward's best interests*." (Emphases added.) 755 ILCS 5/11a-18(a) (West 2000).

¶ 19    Applying the language of section 11a-18(a-5), the initial question is whether executing the proposed estate plan is something that Donald would do if he were "not under disability." 755 ILCS 5/11a-18(a-5) (West 2000). It is undisputed that if Donald was not disabled today, he would be able to execute an estate plan that deviates from intestacy. In fact, the trial court determined that preparing a trust and pour over will is something that Donald would do if he was not disabled today and the trial court ordered the preparation of the necessary documents.

¶ 20    The next sentence in the paragraph "authorize[s] the taking of an action or the application of funds *** in keeping with the ward's wishes so far as they can be ascertained." 755 ILCS 5/11a-18(a-5) (West 2000). We read this sentence along with section 11a-18(a-5)(6), which authorizes specific types of "[a]ctions or applications of funds," including the creation of a trust for the benefit of the ward or others which extends beyond the ward's lifetime. 755 ILCS 5/11a-18(a-5)(6) (West 2000). Together, this statutory language authorizes the execution of an estate plan for Donald which benefits Donald or others beyond his lifetime.

¶ 21    The concluding phrase in that sentence, which indicates that the action is to be "in keeping with the ward's wishes so far as they can be ascertained" and the next three sentences set out the scope of the guardian's consideration, the court's consideration, and the content of the estate planning documents. As suggested by the parties' arguments, the statute *twice* mandates that the ward's wishes are an essential consideration of the guardian and the court. The guardians' actions shall be "in keeping with the ward's wishes so far as they can be ascertained" and the "ward's wishes as best they can be ascertained shall be carried out." 755 ILCS 5/11a-18 (West 2000). The GAL reads "so far as they can be ascertained" and "as best they can be ascertained," to equate with "only if they can be ascertained," but the statute does not suggest that the ward's wishes and only the ward's wishes may be carried out. The General Assembly did not indicate that when a ward is incapable of forming and communicating specific wishes, that a guardian's efforts to act on the ward's behalf are stymied. Moreover,

there are likely instances when a ward's wishes are not sufficiently comprehensive or in their best interests. The statute's wording indicates that the General Assembly anticipated that it will not always be possible to clearly ascertain and act on the ward's specific wishes. In such cases, the guardian will have to consider the specific statutory language which authorizes estate planning in the context of the other sections of the Probate Act that generally govern a guardian's actions. Section 11a-18 in particular indicates that the estate guardian may act "for any other purpose which the court deems to be for the best interests of the ward." 755 ILCS 5/11a-18 (West 2000).

¶ 22    Thus, reading the relevant sections of the Probate Act together, the preferred approach to estate planning is to follow the ward's subjective wishes, to the extent those wishes can be ascertained, but the overriding principal is to act in the ward's objective "best interests." This two step approach to a disabled ward's care is well established. Under what is known as "substituted judgment," a surrogate decision maker will attempt to determine and show the court, with as much accuracy as possible, what decision the ward would make if he were competent to do so. See *In re Estate of Longeway*, 133 Ill. 2d 33, 49, 549 N.E.2d 292, 299 (1989); Elizabeth G. Clark, *Substituted Judgment: Medical and Financial Decisions by Guardians*, 24 Est. Plan. 66 (1997). If the ward's competent wishes cannot be clearly proven, then the court will be guided by the more objective "best interests" standard. *In re C.E.*, 161 Ill. 2d 200, 221, 641 N.E.2d 345, 355 (1994).

¶ 23    This dual standard appears not only in the portion of the Probate Act at issue here regarding a disabled adult's estate but also in the section of the Probate Act concerning the disabled adult's person. Even the GAL cites a case regarding the dual standard, *In re Estate of K.E.J.*, which states:

> "[T]he law sets up a dual standard to be applied in situations where [personal] guardians of disabled adults must make decisions for their wards, such as the decision currently before us [regarding the proposed involuntary sterilization of a mentally disabled woman]. First, guardians are to apply a substituted judgment standard, where they attempt to discern what the ward would have wished if she were competent, and then substitute that judgment for their own. See, *e.g.*, *In re Estate of Greenspan*, 137 Ill. 2d 1, 558 N.E.2d 1194 (1990) (guardian had standing to seek removal of artificial life support for ward in a permanent vegetative state, when testimony established that the ward would likely have refused such treatment if competent). If there is clear and convincing evidence to demonstrate the course of action that the ward would have taken if competent, then those wishes take precedence over any best interests analysis. *Greenspan*, 137 Ill. 2d at 18, 558 N.E.2d at 1202. However, if the guardian is unable to determine such wishes 'after reasonable efforts to discern them,' then the guardian should instead act to further the ward's best interests. 755 ILCS 5/11a–17(e) (West 2006)." *In re Estate of K.E.J.*, 382 Ill. App. 3d 401, 418, 887 N.E.2d 704, 720 (2008).

¶ 24    We do not consider *In re Estate of K.E.J.* to be directly on point because the opinion concerns the authority of a personal guardian. Nonetheless, its discussion of the dual standard is helpful. The GAL, however, misconstrues the discussion to mean that if the guardian is unable to determine the ward's wishes, then the guardian would be reduced to guessing at the ward's wishes, and must, therefore, fall back to the rules of intestacy.

¶ 25    It has also been said:

"Unless an agent is permitted to exercise some kind of independent decisionmaking, an incapacitated person may effectively be prevented from taking certain actions–especially with regard to health care decisionmaking and financial or estate planning–that a nonincapacitated person is able to take. For instance, the incapacitated individual might be unable to make gifts to take advantage of the gift tax annual exclusion. Or, medical treatment might be administered that may be inappropriate or undesired. In these circumstances, it arguably can be said that an individual's incapacity should not put him or her in a different position from those who still have the capacity to make their own decisions.

To remedy this situation, the legal principle known as the doctrine of substituted judgment has been incorporated into judicial decisionmaking and, in some jurisdictions, statutory law. The doctrine first appeared in English cases addressing the ability of the court to authorize the distribution of a portion of the incapacitated person's income or assets to others, usually family members. Although the term 'substituted judgment' was not used, the action was justified on the ground that the court would not 'refuse to do, for the benefit of the [incapacitated person], that which it is probable the [incapacitated person] would have done.' " Elizabeth G. Clark, *Substituted Judgment: Medical and Financial Decisions by Guardians*, 24 Est. Plan. 66, 68 (1997).

¶ 26 Turning back to our analysis of the wording of section 11a-18 of the Probate Act, we consider the sentence indicating "[t]he court must consider the permanence of the ward's disabling condition." The GAL argues this means that when a disabling condition is permanent, the hands of the estate guardian are tied. According to the GAL, this means that when a ward has been cognitively impaired since birth and there is no evidence that it is a temporary impairment which will abate, then there is no section of the Probate Act that authorizes the trial court to approve execution of an estate plan with distributive language that deviates from intestacy. This conclusion is unreasonable. Although Donald's cognitive deficits have thus far prevented him from expressing his wishes for his estate, the estate guardian is generally empowered to act in Donald's best interests, which may mean deviating from intestacy.

¶ 27 Furthermore, in our opinion, the requirement to "consider the permanence of the ward's disabling condition" means the court should consider the possibility that the ward's disability is a temporary one which obviates the need for the guardian to take certain actions. If the ward is under a temporary disability, then the court should be less inclined to approve the creation of a new plan or the replacement of an existing plan. In Donald's case, however, it appears his disability is permanent and will forever prevent him from engaging in his own personal planning for his considerable estate. We are not persuaded by the GAL's argument that Donald's permanent disability should thwart the coguardians' attempts to act in Donald's best interests.

¶ 28 Continuing, the statute states that "[t]he court must consider *** the natural objects of the ward's bounty." 755 ILCS 5/11a-18 (West 2000). The GAL ties this language to Donald's lack of testamentary capacity. However, testamentary capacity consists of " 'the ability to know and understand the natural objects of one's bounty [and] the nature and extent of one's property' and to form a plan to dispose of the property." *In re Estate of Jones*, 159 Ill. App. 3d 377, 382, 512 N.E.2d 1050, 1053 (1987) (quoting *Manning v. Mack*, 119 Ill. App. 3d 788, 804,

457 N.E.2d 447, 456 (1983)). The GAL contends that Donald's lack of testamentary capacity precludes the proposed estate plan that would benefit Turks and disinherit the father and the father's additional children. This is incorrect. No part of the statute requires Donald to have testamentary capacity. Instead, it is not the ward, but "[t]he court [that] must consider *** the natural objects of the ward's bounty." 755 ILCS 5/11a-18 (West 2000). Consistent with that statutory language, the estate coguardians have asked the court to consider the natural objects of Donald's bounty and determine that Donald's mother, who has been his primary caregiver, should benefit from his estate, while other individuals who are closely related by blood but not involved in Donald's life should not benefit from the estate.

¶ 29    The dispute here centers on how to determine which "others" may benefit from the estate planning. The trial court's finding–as a matter of law–that Donald's estate plan could not deviate from intestacy was error. Section 11a-18(a-5) does in fact expressly authorize an estate plan which deviates from intestacy, by indicating that a proposed trust may serve to benefit persons other than the ward during the ward's life and that trust property may be conferred to others beyond the ward's life. 755 ILCS 5/11a-18(a-5) (West 2000). Further authority for deviating from intestacy is found in the statement that the "guardian shall not, however, be required to include as a beneficiary or fiduciary any person who [the guardian] has reason to believe would be excluded by the ward." 755 ILCS 5/11a-18(a-5) (West 2000). Reading subsections (a) and (a-5) together, the guardian of the estate of a disabled adult is obligated to propose to the court that a trust established as part of an estate plan include as beneficiaries only those individuals whom the guardian has reason to believe the ward would choose to include, if the ward was present and not under disability. In other words, the guardian is in the position to initially assess who should be a beneficiary of the proposed estate plan.

¶ 30    The statute's language is clear, however, we also point out that if the General Assembly had wanted to limit estate plans for adults such as Donald to the rules of intestacy, then it would have said so, such as it did in section 11-13(b) of the Probate Act, which is a portion of the statute that applies only to the estates of minors. 755 ILCS 5/11-13(b) (West 2000) (statute entitled "Duties of guardian of a minor"). Section 11-13(b) authorizes the guardian to petition to execute an estate plan on behalf of the minor but indicates that any proposed plan must conform to the rules of intestacy. More specifically, the minors' section of the Probate Act states in part:

> "The court, upon petition of a guardian of the estate of a minor, may permit the guardian to make a will or create a revocable or irrevocable trust for the minor ***; however, the will or trust must make distributions only to the persons who would be entitled to distributions if the minor were to die intestate and the will or trust must make distributions to those persons in the same amounts to which they would be entitled if the minor were to die intestate." 755 ILCS 5/11-13(b) (West 2000).

Once a minor reaches his or her eighteenth birthday, their court-appointed guardian is discharged. 755 ILCS 5/24-12 (West 2000). If the emancipated 18-year-old suffers from a disabling condition (*e.g.*, mental deterioration, physical incapacity, mental illness, or physical incapacity) which prevents the person from being fully able to manage his or her person or estate (755 ILCS 5/11a-2 (West 2000)), then a petition for guardianship pursuant to the adult disabled section of the Probate Act may be filed. 755 ILCS 5/11a-3 (West 2000). As set out above, the adult disabled section of the Probate Act does not contain the same provisions as the minor section of the Probate Act. Unlike the minor section of the statute, the adult section of

the statute neither expressly requires nor suggests that a will or trust drafted for the disabled person make distributions as if that person were to die intestate. 755 ILCS 5/11a-18(a-5) (West 2000).The difference between the minor and adult sections is significant to this appeal because it demonstrates that when the General Assembly wishes to dictate a certain result, it knows how to do so and it has done so expressly. *City of Chicago v. Roman*, 184 Ill. 2d 504, 705 N.E.2d 81 (1998) (holding that when the General Assembly has used specific language in other similar statutes, then the absence of that language in a certain statute means the General Assembly did not intend for that language to apply); *Sharp v. Board of Trustees of the State Employees' Retirement System*, 2014 IL App (4th) 130125, ¶ 26, 5 N.E.3d 188 (stating that despite similarities between two pension boards, the legislature decided to include an express provision granting only one of those boards the authority to correct its mistakes at any time and that if the legislature intended for the second board to also have this authority, then "surely it would have stated as much"). Because the adult disabled section of the Probate Act does not require compliance with intestacy for any disabled adult's estate plan, then the absence of that language confirms the General Assembly's intention that no such requirement be imposed on the estate plan at issue.

¶ 31        For these reasons, we conclude that the trial court imposed a condition which the General Assembly did not intend when the court ruled that as a matter of law, Donald's estate plan had to follow the rules of intestacy.

¶ 32        Furthermore, ruling as a matter of law was in disregard of the trial court's plain obligation to "determine[ ]" whether the action proposed by the guardian is "in keeping with the ward's wishes so far as they can be ascertained" and "for the best interests of the ward." 755 ILCS 5/11a-18(a), (a-5) (West 2000). The coguardians' proposal to leave Donald's estate to his mother, who has been his fulltime caregiver, and to disinherit other relatives who have purportedly chosen to have little to no interaction with Donald created a question of fact rather than a question of law. Donald's 10 half siblings, 9 of whom are just slightly older than Donald, have not responded to notice of these proceedings. Donald's father has disputed whether his relationship with Donald has been lacking. Even if Donald's father was not objecting to the proposed plan, the court must determine whether the guardians' proposed action is "for the best interests of the ward." 755 ILCS 5/11a-18(a) (West 2000). This requirement is "intended to substitute a judicial determination for the guardian's personal discretion in order to provide additional protection to the ward." *Burton v. Estrada*, 149 Ill. App. 3d 965, 976, 501 N.E.2d 254, 262 (1986) (the requirement of court approval is intended to provide additional protection to the ward). "This role is not passive, and it is *not* sufficient for the court to accept the recommendation of the GAL, estate or personal guardian, or anyone else without further inquiry." (Emphasis in original.) *In re Guardianship of Mabry*, 281 Ill. App. 3d 76, 85, 666 N.E.2d 16, 21 (1996). "The trial court is to 'protect[ ] the incompetent as its ward, vigilantly guarding his property and viewing him as a favored person in the eyes of the law.' " *Mabry*, 281 Ill. App. 3d at 85, 666 N.E.2d at 21 (quoting *In re Estate of Berger*, 166 Ill. App. 3d 1045, 1055, 520 N.E.2d 690, 697 (1987)).

¶ 33        Donald's father offers a different line of reasoning in support of the trial court's ruling Howell contends the controlling statute is section 2-2 of the Probate Act which speaks to the distribution of property from the estate of a child born out of wedlock. 755 ILCS 5/2-2 (West 2006). The law statutes in relevant part:

"The intestate real and personal estate of a resident decedent who was a child born out of wedlock at the time of death ***, after all just claims against his or her estate are fully paid, descends and shall be distributed as provided in Section 2-1 [of the Probate Act, (which sets out the rules of intestacy)], subject to Section 2-6.5 of this Act, [which permits the probate court to reduce or eliminate distribution to a parent who has willfully neglected, deserted, or failed to provide support to the child] if both parents are eligible parents. As used in this Section, 'eligible parent' means a parent of the decedent who, during the decedent's lifetime, acknowledged the decedent as the parent's child, established a parental relationship with the decedent, and supported the decedent as the parent's child." 755 ILCS 5/2-2 (West 2006).

¶ 34    Howell contends the first clause of section 2-2 plainly indicates parental eligibility is not to be determined until after Donald's death and that there is no precedent allowing a court to determine parental eligibility during the lifetime of the ward. Thus, Howell, like the GAL, sees no need for a best interests hearing at this time. He concludes the executed estate plan is a correct one.

¶ 35    We do not find Howell's argument persuasive. There is no statutory language indicating section 2-2 is to be incorporated into section 11a-18 in order to trump an estate guardian's efforts to engage in reasoned estate planning for a disabled ward. 755 ILCS 5/2-2 (West 2006); 755 ILCS 5/11a-18 (West 2000). Section 2-2 clearly is relevant (1) only after an individual's death and (2) only if that individual has died without a will. 755 ILCS 5/2-2 (West 2006). Therefore, it does not apply to the preparation of Donald's estate plan. The coguardians of Donald's estate have proposed a trust, a will, and an assignment which dispose of all the estate's assets. Regardless of whether that particular plan is adopted or some other plan proves to be in Donald's best interests, a plan will be adopted. Donald will not die intestate. Section 2-2 is not controlling. For this same reason, it was error for the trial court to purport to preserve Turks' rights after Donald's death to file a section 2-2 petition to reduce or eliminate distribution to Howell on grounds of willful neglect, desertion, or failure to provide support.

¶ 36    We conclude that the statutory interpretation advocated by the coguardians is reasoned and persuasive while the arguments advanced in favor of the trial court's ruling are unsound. We find that the trial court imposed limitations on the guardians' actions which were not intended by the legislature. The portion of the order which approved the creation of an estate plan is not in dispute. The remaining portion of the order, which requires that the plan follow the rules of intestacy and purportedly preserves Turks' rights under section 2-2, is vacated as erroneous. We remand with directions to proceed to an evidentiary hearing consistent with the reasoning of this court. The record does not establish whether an estate plan which deviates from intestacy is in Donald's best interests. This is to be determined on remand.

¶ 37    Attorney fees are the only other issue on appeal. The trial court determined that Donald's estate should not be burdened with the coguardians' attorney fees because Donald derives no benefit from the appeal. The court made this determination as a matter of law before the coguardians had prepared a petition detailing their fees.

¶ 38    The coguardians now argue the trial court's reasoning is flawed because a guardian's permissible actions are not limited to ones that directly benefit the ward. For instance, section 11a-18 of the Probate Act authorizes the coguardians to petition to effect an estate plan that minimizes inheritance taxes and makes gifts to others. 755 ILCS 5/11a-18(a) (West 2000). They contend these are examples of actions that are not directly beneficial to Donald but are

contemplated by the law because they may be in his best interests and that guardians are obligated to take actions that they believe to be in the ward's best interests. They also contend the appeal was brought in good faith after the trial court first granted fees for petitioning, drafting and arguing for an estate plan that deviated from intestacy, even though the plan itself was rejected as a matter of law, but then denied fees for advocating the same position on appeal. Furthermore, they argue, the award of attorney fees will not significantly reduce the current value of Donald's estate.

¶ 39    The GAL contends a fee award would not pass a cost-benefit analysis, where Donald receives no benefit from this attempt to upset the trial court's order and where an award would further deplete an estate that is already disbursing more than it is earning.

¶ 40    Along those same lines, Howell argues the distributive portions of the estate plan will be exercised only after Donald's death and will produce no benefit during his lifetime. Howell contends that Turks and Wilkins are the sole beneficiaries of the disputed estate plan and "[t]hey should bear the costs of this appeal." We note that Wilkins is not a party and that we have no reason to believe she has incurred any attorney fees.

¶ 41    Above, we rejected the reasoning that led to the order on appeal and concluded that an estate plan that deviates from intestacy may be in Donald's best interests and that this question should be resolved through an evidentiary hearing. Furthermore, this is a case of first impression and the coguardians were unable to rely on existing case law to definitively guide their actions. Accordingly, we consider this appeal to have been a worthwhile pursuit. Even so, without an actual fee petition, it is impossible to perform the cost-benefit analysis contemplated in *In re Estate of K.E.J.*, 382 Ill. App. 3d at 425, 887 N.E.2d at 725, where the court is to weigh whether the cost of litigation is proportionate to the benefits gained. On remand, the trial court is directed to address the fee petition.

¶ 42    Reversed and remanded with directions.